THE PEOPLE on the relation of SMITH *a.* FLAGG.

*Supreme Court, Second District; Special Term, June,* 1857.

POWERS OF COMMON COUNCIL.—PROFESSIONAL SERVICES.—COSTS.

The common council of the city of New York have power to employ the services of a surveyor in the work of preparing a map of city property; and whether such work will be beneficial to the city is a question solely for its consideration.

The provision of the city charter requiring that the various departments shall advertise for sealed proposals for contracts for all "work" involving an expenditure exceeding $250, does not apply to professional services;—*e. g.*, those of a surveyor in preparing a map. Where professional services are to be employed, the common council have a power of selection, with reference to securing the requisite skill, and no advertisement is required.

Costs should not be awarded to relator on granting a writ of mandamus against a public officer, where it appears that his refusal to comply with the demand of relator was conscientious, and was founded on reasonable grounds.

Application for a mandamus.

The facts appear sufficiently in the opinion of the court.

*H. H. Anderson,* for the application.

*M. V. B. Wilcoxson,* opposed.

S. B. STRONG, J.—On July 8, 1856, an alternative mandamus was issued from this court, requiring the defendant, as comptroller of the city of New York, to draw his warrant upon the chamberlain of that city, directing him to pay to the relator $1250, which he claimed to be due to him for services performed by him under a resolution of the common council of such city, and which warrant, the same common council, by another resolution, adopted after the services had been rendered, had directed the

comptroller to draw; and, in default thereof, to make known why he should refuse to do so. The defendant refused to draw the warrant, and assigned various reasons for his refusal in his return to the writ, the more material of which I shall consider, after making a concise statement of the facts upon which the relator's claim is founded.

On February 20, 1855, the common council passed the following resolution : " Resolved, that the street commissioner be, and he is hereby directed to furnish to each member of the common council, to the mayor's office, and to the chambers of the boards of aldermen and councilmen, a copy of the map of wharves and piers of the North and East rivers, as originally drawn by Daniel Ewen, city surveyor, and embracing the alterations and additions to this date." About April 1, 1855, the resolution was put into the hands of the relator, who was at the time (as stated in the return) a city surveyor, " an officer in the bureau of surveying, a bureau in the street department of the city," by the street commissioner, with a verbal direction " to comply with the requirements of the same." It is in effect admitted in the return that the relator thereupon made a complete survey of all the piers and bulkheads within the district specified in the resolution. The reason for this, according to the report of the finance committee of the board of councilmen, which was submitted to me without objection on the argument, was, that " upon examination it was found the alterations and additions were so many, since the date of Mr. Ewen's map, in January 1, 1849, as to render necessary a complete new survey of the wharves and piers, from Thirteenth-street on the North River, around the Battery to Thirteenth-street on the East River." The surveys and examinations were commenced immediately on the receipt of the instructions from the street commissioner, and prosecuted with all possible dispatch, the work occupying a large portion of the time, many of the piers in the lower part of the city having to be measured early on Sunday mornings, owing to their crowded state during the ordinary working days ; and during such time the relator employed one draughtsman and two out-door assistants. It appears from the same report that, with a few exceptions, all the piers within the specified limits, which existed at the time of Ewen's survey, had been altered, either by extending or widening the same ; that quite a number of new piers had

been built; and in many places the line of bulkhead had been changed, by carrying the same out into the rivers. The report also asserts that the relator " did but his duty as a faithful officer of the street department, in making the surveys." The relator from his original field-notes, and his line or rough drawings, compiled a minute and accurate map, of which five hundred lithographic copies were printed and bound under his direction and supervision, and delivered to the common council. Some of the statements in the report to which I have alluded are not included in the return, but they are referred to as the probable inducements for the adoption by the common council of the following resolution, which became effective on June 26, 1856 : " Resolved, that the comptroller be, and he is hereby directed to draw his warrant in favor of Edwin Smith for the sum of twelve hundred and fifty dollars, in payment for surveys and maps of the wharves and piers North and East rivers, and that the sum be taken from the appropriation for docks and slips, new work." The services rendered by the relator were not upon any contract founded on sealed or other bids or proposals, but were devolved upon him in the performance of his duty as an officer of the corporation.

That the services were performed in the appropriate business of the city, there can be no doubt. The common council had the requisite jurisdiction over the subject-matter, and whether the proposed work would be beneficial or not was a question solely for its consideration. In that particular this case differs essentially from the People *v.* Lawrence (6 *Hill*, 244); Hodges *v.* The City of Buffalo (2 *Den.*, 110); and Halstead *v.* The Mayor of New York (3 *Comst.*, 430). In The People *v.* Lawrence the claim was for counsel fees, and other expenses attending the defence of a special justice on an impeachment. Judge Bronson placed the decision, which was adverse to the claim, expressly on the ground that the supervisors " had no jurisdiction over the subject-matter." In Hodges *v.* The City of Buffalo, the plaintiff, who was a hotel-keeper, sought to recover the expenses of an entertainment for the celebration of the anniversary of our national independence, which had been provided at the request of a committee appointed partly by the common council and the residue by the inhabitants of that city. The plaintiff failed, on the ground that the common council had no authority " to pro-

vide for entertainments upon any occasion whatever." In Halstead *v.* The Mayor of New York, the plaintiff attempted to recover the amount of two drafts upon the treasurer of the city, which were issued pursuant to a resolution of the common council for the payment of certain judgments recovered against the supervisors in suits for alleged violations of their duty in refusing to pay the salary of a city judge, alleged by them to have been unconstitutionally ·imposed upon the city, together with their taxable cost and reasonable counsel fees, incurred in the defence of the suits. The Court of Appeals affirmed the judgment of the Supreme Court, which was adverse to the plaintiff, on the ground that " the common council had no authority to assume the defence of the suits or the payment of either the penalties or the costs." Judges Bronson, Ruggles, and Harris dissented, and it seems to me, with great deference to the other learned judges, with the better reason, as the supervisors had acted from a disposition to save the city from an unconstitutional expenditure. The principle on which those cases were decided, was not that the corporations had acted irregularly, but that they could not act in such matters at all, and is clearly inapplicable to the claim presented in this instance.

The comptroller supposes that the street commissioner should have published a notice inviting sealed bids or proposals for the work to be done, and awarded a contract for it to " the lowest bidder with adequate security," as it involved an expenditure of over two hundred and fifty dollars, pursuant to section 12 of the amended charter passed April 12, 1853, and that he could not legally devolve its performance upon the relator. The terms of that section are certainly very general, embracing all work to be done, and all supplies to be furnished for the corporation. The word " work" may comprehend all labor, whether corporeal or mental, but in its popular sense, it is applied solely to bodily labor, or that in which such labor is the principal ingre- ·dient,—that, I am satisfied, is the sense in which it is used in the act. If the section to which I have here alluded has that reasonable construction which is uniformly given to statutory provisions, it must apply exclusively to such work as may be the subject of general competition, and can be safely awarded to the lowest bidder. When ordinary or mechanical labor only is required, the danger of awarding a contract for its performance

to an incompetent person may be avoided by minute specifications and constant supervision. But in avocations strictly professional, which require for their successful pursuits a learned education, no specifications or supervision can prevent the disasters and losses which would result from the employment of ignorant or unskilful persons, who might happen to be the lowest bidders. It is true that such bidders must give security,—but security for what? Doubtless for the faithful performance of the contract. But what security could be given for the skill and minute observances which are so essential to success in professional pursuits? No individual of ordinary prudence or discretion would confide the preservation of his estate to the lawyer, or of his health to the physician, who might be the lowest bidder under a public advertisement. The common council of the city of New York should unquestionably have the same power of selection in such cases. They frequently employ assistant counsel to argue their important cases, and clergymen, physicians, and teachers to attend their public institutions. Can it be that the Legislature intended to compel them to advertise for contracts in such cases, and to award them to the lowest bidder even " with security"?

The profession of a surveyor requires learning, skill, and practice for its successful and profitable pursuit. The business should be confided to those who have received a competent education, and to those alone. It cannot, and should not, be made a subject for general competition. Even among those who have received a regular education, the right of selection is all-important to corporations as well as to individuals. I am satisfied that the Legislature never intended to deprive the corporation of such right; but even if the terms of the statute should necessarily require that contracts for surveying should be advertised and given to the lowest bidder, they would not include the one under consideration. Here there was evidently no contract, but the requisition of an official employment. The corporation has appointed city surveyors, and, doubtless, under competent authority. The duty of those officers is to make surveys for the common council, for which, as the comptroller states in his return, they are paid stated fees. Surely it is competent for the common council to employ their own officers to perform the duties of their office, such, for instance, as their police officers and watchmen, without advertising for contracts for such ser-

vices. I am clear that it was competent and proper for the street commissioner to devolve the performance of the resolution of February 28, 1855, upon a city surveyor, as an official duty, and that he was not required to call for a contract. The cases which were cited on the argument as to the supposed necessity of advertising for and making a formal contract in this case are inapplicable. In the case of The People on the relation of Hagar *v.* Flagg, decided by Judge Whiting, the charge was for work performed in regulating and changing the grade of an avenue in accordance with a previously adopted plan; and it was rightly held, that as no contract had been made pursuant to public notice, the claim could not be sustained. In the cases of The People *on rel.* McSpedon & Baker *v.* Stout (4 *Abbotts' Pr. R.*, 22), and The People *on rel.* McGill *v.* Stout (*Ib.*, 22), decided by Judge Davies, the charges were in the first one for repairing the books of record in the register's office, and in the second for painting the rooms occupied by the Superior Court. Both charges were for labor which might properly have been made the subjects for general competition, and neither required any professional education for the successful performance of the service, and it was properly decided that, as there had not been any contract pursuant to public notice, the claims were invalid and irrecoverable. In the case of Peterson *v.* The Mayor of New York, decided by the Court of Common Pleas of the city of New York, at a general term, the plaintiff demanded compensation for preparing certain plans and specifications for the rebuilding of the Washington Market. The plaintiff had performed the service under the directions of one or more members of a committee of the Board of Aldermen, under a resolution passed by that board alone, and the plans had been adopted by both boards, but without any intimation of an intention to pay for them. In that case Judge Ingraham, who delivered the opinion of the court, said: "I am not prepared to say that there was any thing in the charter of 1849 which would have prohibited the defendants by an express resolution from employing the plaintiff to prepare these plans. The nature of the work, the skill necessary to the proper performance of it, and the still more important employment of superintendence which might follow the adoption of the plan, all call for the existence of such right of a choice as to the person to be employed therefor, nor do I think that the provisions are

sufficient to take away from the common council such right. Many kinds of employment in regard to the work to be done for the city are of such a peculiar character as to render it impossible with safety to expose it to the lowest bidder. The case mentioned by Mr. Justice Mitchell, in Christopher *v.* The Mayor (13 *Barb.*, *S. C. R.*, 567), that of painting a portrait for the mayor, or other distinguished individuals, is strongly in point, to show that such work could not be let out to the lowest bidder, and so also is the present case one of a similar character." The claim of Mr. Peterson was rejected, principally on the grounds that the common council had neither engaged him to perform the service, nor directly promised to pay for it after it had been completed. In both particulars that case differs from the one now under consideration.

In this case the comptroller objects that the services of the relator considerably exceeded what was contemplated by the resolution under which he acted. That is undoubtedly true. He made an entire survey of all the wharves, piers, and slips, instead of those alone which had been constructed or altered subsequent to the date of Ewen's map, and he had printed and bound five hundred lithographic copies of his map, far exceeding the limited number mentioned in the resolution. It seems that in both of these particulars he followed the directions of the street commissioner, and the extension of the survey, according to the report of the finance committee to which I have referred, was absolutely necessary to effectuate the object designed by the common council; still I should doubt whether these considerations would have been sufficient to have raised an *implied* promise which would have bound the corporation, on the principle that no one can be made a debtor without his consent. But as the services were clearly in matters over which the common council had control, and were, according to the report of the committee to which I have alluded, and as might be fairly inferable from the confirmatory resolution, beneficial to the city, they furnished a sufficient consideration to sustain an express promise, such as was in effect made by the resolution of June 26, 1856. It is remarked by Sergeant Williams, in a note to Osborne *v.* Rogers (1 *Saund.*, 264, *note* 1), that " when a party derives a benefit from the (past) consideration, it is sufficient, because equivalent to a previous request; as where a

man pays a sum of money, or buys any goods for me without my knowledge or request, and afterwards I agree to the payment or receive the goods, this is equivalent to a previous request to do so; but it is still necessary to aver in the declaration that it was money paid and laid out for me at my special instance and request, and my subsequent conduct will be evidence of it." The technical rule mentioned by the learned commentator was one of pleading only, and it was that which governed the Supreme Court in the cases usually cited on this subject from Caines' and Johnson's reports. The principle sustaining the validity of a promise made under such circumstances is so palpably just and reasonable, that it may well be assumed as sound and indisputable.

The comptroller's objection that no appropriation had been made previously to the adoption of the resolution causing the consequent expense, agreeably to section 19 of the amended charter of April 2, 1849, is answered by the direction in the resolution for payment that " the sum be taken from the appropriation for docks and slips, new work." This appropriation had no doubt been made previous to incurring the expense, and " covered" it.

The return raises an objection, that the eventual allowance of a sum in gross exceeded the compensation provided for surveyors by section 229 of the ordinances organizing the departments of the municipal government of the city, contrary to an express direction in section 10 of the amendatory act of April 12, 1853. According to my notes, this point was not discussed at all upon the argument, and probably but little, if any, reliance was placed upon it by the counsel for the corporation. If the plaintiff's demand had been simply for a compensation for such services as are specified in section 229 of the ordinances, and had exceeded the rates therein mentioned, I should have deemed the objection fatal to any recovery by him, certainly beyond those rates, and especially in the absence of any account stating the particulars. But that section refers simply to the services in making the survey, and the consequent protraction or profile of it. There was additional work authorized, and considerably more performed, under the resolution in this case, for which no. specific allowance is made in the ordinance; for that, it was competent for the common council to

make such compensation as was deemed proper. As to the extent, they had a discretion which could not be contracted. Now I cannot assume that the sum awarded to the relator exceeded the per diem pay of the surveyors, and such amount as was deemed reasonable for the non-enumerated services. The usual inference in such cases is, that public officers, and even those of corporations, have done their duty according to law until facts are shown to the contrary. There is nothing in this case to indicate corruption or impure motives in the members of the common council; on the contrary, I am inclined to think, and especially from the statements in the reports of the committee on finance, that the sum awarded to the relator is no more than a reasonable and just compensation for the services rendered by him.

The account presented to the comptroller was verified by his oath, and confirmed by the resolution of the common council, and no further voucher was necessary.

The comptroller is undoubtedly authorized to audit the accounts presented to him against the corporation. But in this case all the prerequisites had been settled by the previous action of the common council. When such action was communicated to him, and the proper voucher was presented, there was nothing additional for him to audit,—nothing in the case calling for the exercise of any discretion on the subject. The comptroller was then bound to issue and deliver to the relator the necessary warrant.

The result is, that a peremptory mandamus must go. As the comptroller has doubtless acted conscientiously in this matter, and as the objections raised by him, although as I deem them invalid, are by no means frivolous, no costs are awarded.