## THE CITY OF HARTFORD vs. THE HARTFORD ELECTRIC LIGHT COMPANY AND OTHERS.

First Judicial District, Hartford, October Term, 1894. ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

The Act of 1869 amending the city charter (Special Acts, Vol. 6, p. 743) and establishing a board of street commissioners for the city of Hartford, conferred upon that board certain executive powers previously vested in the Court of Common Council. *Held :—*

1. That the power "to superintend and provide for the lighting of the street lamps" was thus vested in the board as an independent department of the city government, and in the proper exercise of that power the board was not the mere servant or agent of the Court of Common Council.

2. That the action of the board in making a contract, in the name of the city, with an electric light company for supplying, in accordance with the system of street lighting adopted by the Court of Common Council, electricity necessary for lighting the lamps erected in pursuance of the orders of said court, was within the powers vested in the board, and such contract, being otherwise valid, was binding on the city.

3. That if the city ordinance directing the board of street commissioners to make certain provisional contracts subject to the approval of the

Court of Common Council can be construed as prohibiting the board from making any contract necessary to the proper execution of its power of lighting the street lamps, unless such contract is approved by said court, then the ordinance, to that extent, is void.

4. Such contract cannot be held void merely because it was not advertised under the provisions of the city ordinance requiring all contracts for city work exceeding in amount $500 to be publicly advertised and the contract awarded to the lowest responsible bidder; especially as it appeared from the record that the electric light company by reason of its ownership of the plant erected by permission of the city was practically the only company which could, without delay, furnish the electricity to the city.

5. The mere fact that such contract might extend for five years, in case the city continues so long to be satisfied with its performance, does not make it void.

[Argued October 3d, 1894—decided January 8th, 1895.]

ACTION for the delivery and cancellation of a certain contract for lighting the streets of the plaintiff city, also for an injunction; brought to the Superior Court in Hartford County and tried to the court, *Shumway, J.*, upon demurrers of the defendants to the complaint; the court sustained the demurrers, rendered judgment for the defendants, and the plaintiff appealed. *No error.*

The case is sufficiently stated in the opinion.

*Charles E. Perkins*, with whom was *Arthur Perkins*, for the appellant (plaintiff).

*Charles J. Cole*, for the appellee, Hartford Electric Light Co. (defendant).

*Charles E. Gross*, for the appellee, Board of Street Com'rs (defendant).

HAMERSLEY, J.   On March 13th, 1893, the board of street commissioners of the city of Hartford, acting for and in the name of the city, made an agreement with the defendant, the Hartford Electric Light Company, relating to the supply of electric lights for the streets and public places of the city. The following October the city brought a complaint in equity to the Superior Court, alleging that this agreement had not

been approved by the Court of Common Council of said city, and had not been publicly advertised before its execution, as required by the city ordinances specified; that for these reasons the agreement is invalid; and claiming that the agreement be declared void and be ordered to be canceled and delivered up to the city. To this complaint the defendant demurred. The Superior Court sustained the demurrer, and gave judgment for the defendant. This is an appeal by the plaintiff from that judgment.

The complaint joined the present street commissioners as parties defendant; claiming an order enjoining them from making any contracts for erecting or lighting the street lamps, except subject to the approval of the Court of Common Council; and from making any contracts without first publicly advertising the same in manner provided by ordinance. The street commissioners demurred to the complaint, and this demurrer was also sustained.

In addition to the main grounds of demurrer, i. e., that the agreement is not void for the reasons alleged in the complaint, the demurrers specify several reasons why the complaint is insufficient on account of misjoinder and defective statements of the cause of action. If the demurrers were sustained on these grounds alone, it may be possible that the complaint might be amended so as to properly present the main issue; we think, therefore, that issue should be disposed of, and as the conclusion we reach excludes the defendant from the right of action claimed, it is unnecessary to discuss any of the other questions raised by the demurrers.

Is the agreement void for the reasons alleged? The answer to this question involves a consideration of the powers of the board of street commissioners, and its authority to bind the city by its agreements relative to the subject-matter of the contract. The arguments on behalf of the plaintiff and defendant evidently proceed on different theories of the legal status of the board. The plaintiff treats the board as an agent of the Court of Common Council, exercising independent powers only in matters of temporary emergency which cannot conveniently await the action of the court, and al-

City of Hartford *v.* Hartford Electric Light Co. et al.

ways in subordination to its principal. The defendant treats the board as the agent, not of the common council but of the city and State, deriving its powers directly from the legislature in the same manner as the Court of Common Council derives its powers. We think the latter theory, so far as it affects the exercise of powers directly vested in the board of street commissioners by statute, is the correct one.

Our first incorporation of cities in 1784 followed pretty closely the lines of the royal charters from which the ancient town corporations of England derived their privileges. Such incorporated trading communities, enjoying privileges peculiar to themselves, protected by royal power from encroachments by other subjects of the realm, have played an important and most useful part in history; but the conditions which made them useful have long since ceased to exist, and the theory which underlay their creation is inconsistent with our whole system of government. An incorporated town is no longer a trading corporation; it is the agency by which the government of the State is administered within its territorial limits. The special privileges that are still allowed to cities as private corporations, are relics of past conditions; their survival is largely due to the force of old associations, and does not express the present policy of municipal government. Some of such surviving privileges are inconsistent, in spirit at least, with those provisions for equal laws and prohibitions of special privileges that are incorporated in all our State constitutions. In many States, by constitutional enactment, the special incorporation of cities is forbidden; and in all States the legislative policy tends to treat cities mainly, if not solely, as mere governmental agencies.

A common feature in the ancient charters was the concentration of all granted powers in the warden and burgesses, or mayor and council, of the incorporated town. As a single corporate body these officers had control of the special privileges and property of the corporation, as well as the sole exercise of nearly all its governmental powers, executive, legislative and judicial. When our first cities were

incorporated the legislature followed the ancient custom. Nearly all powers were vested in the mayor, aldermen and common council. The mayor and aldermen were justices of the peace for the city. The City Court was composed of the mayor and aldermen. All legislative and nearly all executive powers granted were vested in the mayor, aldermen and common council, who sat as one body, and in the exercise of legislative powers were called the Court of Common Council. In carrying out their executive powers all officers were the servants and agents of the single body composed of the mayor, aldermen and common council.

But in the past hundred years this scheme of municipal government has been radically changed. The judicial power is no longer exercised by the corporators, but by officers whose terms of office are fixed by the Constitution, and most of whom are appointed by the legislature. The legislative power is no longer vested in the corporators, but in a municipal legislature. The exercise of the executive power is largely, and in some cases wholly, separated from the exercise of the legislative power, and is vested in officers deriving their authority not from the municipal legislature, but directly from the State. Ordinarily such executive powers are vested in independent boards, composed of officers not appointed by nor responsible to the legislative body, and purposely selected in a manner different from that used in the appointment of members of the legislative body. It is evident that such officers in the exercise of powers directly vested in them by statute are not agents of the city legislature, but receive their powers, as well as the common council itself, directly from the State, to be exercised in accordance with the whole body of law regulating the municipal government. It must be remembered, however, that the process by which the character of city governments has been modified has been slow and has consisted in gradually stripping the Court of Common Council—the original unit of civic power—of judicial and executive functions; and so, especially in the cities whose charters antedate our Constitution, the executive powers not specifically vested in exec-

utive officers remain in the common council; and in the present charter of the city of Hartford, this residuum of executive power is covered by the provision that in the Court of Common Council "shall be vested the government, control and management of said city, its property and officers, subject to the exceptions hereinafter set forth." It should also be remembered that the legislative power vested in the common council includes a right to control and regulate by means of local laws the municipal affairs, and necessarily modifies in many ways the execution of powers vested in other departments of the city government. Under such a system it is hardly possible to draw a precise line which shall separate executive from legislative powers. The powers definitely given to each department are modified in their exercise by powers definitely given to the other; the harmonious operation of the system must depend upon the application of that good faith, assumed in all divisions of governmental power, which requires each set of officers to exercise their powers in harmony with the powers given to others; so that the object of the legislature in the apportionment of municipal functions which are essential to the accomplishment of one result, may be made effective for the protection of the city's interests.

In view of the public policy as to the character of city governments, fully settled by the course of modern legislation, we think that the Act of 1869 establishing the board of street commissioners, vested in the board certain executive powers, and forbade the future exercise of those powers by the Court of Common Council; that the board derives its authority to exercise the powers granted directly from the State, and not through the Court of Common Council; that the board must exercise the granted powers in harmony with the legislative and other powers remaining in the council, and the council cannot, through the form of legislation, practically exercise a power which the Act took from it and vested in the board.

An examination of the Act of 1869, in connection with the then existing charter, clearly indicates the general char-

acter and limitations of the powers thus vested in the board of street commissioners.　The Act creates a permanent board, non-partisan in its membership, and provides that its members shall be chosen directly by the people (a later amendment provides for their appointment by the mayor), and shall not be members of the Court of Common Council.　It provides that the board shall keep a record of its doings and an account of its expenditures and receipts, which shall be open to the inspection of any member of the Court of Common Council, but not otherwise subject to its control.　It authorizes the board to appoint a superintendent of the streets, and other officers, to hold office during its pleasure, and to act under its direction in the immediate management of such public works as shall be under the charge of the board.　It provides that the board "shall have power, and it shall be their duty," (1) "to cause to be executed all orders of the Court of Common Council, for the construction or alteration of highways, streets, sewers, gutters, sidewalks, and cross-walks, the exchange or sale of highways, the establishment of building lines, the erection of street lamps, and the raising, filling up or draining of low grounds."　(2) To cause to be executed "all other orders of said court, for the construction, alteration or repair of other public works not expressly ordered to be executed or superintended by other officers or persons."　(3) "To cause the prompt completion of all necessary repairs of streets, highways, sewers, and public works within the limits of the streets, highways, and thoroughfares of the city, other than public buildings; to keep all public places, streets and highways, clear of obstructions and nuisances; to cause the prompt removal of all filth, encroachments, incumbrances, and obstructions; to require all persons to conform to the city ordinances in the use of such streets, highways, and public places; to superintend and provide for the lighting of the street lamps, and the repair of the same; and in general, may do all acts necessary or proper in the execution of the powers and duties aforesaid."　(4) To act as a court for the assessment of betterments and appraisal of damages, and to exercise exclu-

sively all powers vested by the charter in the Court of Common Council in reference to the appraisal of damages and the assessment of betterments. (5) To investigate every new public work relating to highways, as a condition precedent to the powers of the Court of Common Council to order such public work.

The establishment and maintenance of highways and the public works incident thereto, is a principal object of the city government; the cost of executing such work is about one half of the current expenses for all city purposes. The Act of 1869 takes the execution of this work and the disbursement of this money from the Court of Common Council, and vests it in the board of street commissioners, who are for such purpose made a branch of the city government distinct from the Court of Common Council. Section 7 (as re-enacted in 1867) of the charter of 1859, vested in the Court of Common Council this power of executing public works relating to highways, in language almost identical with that used in the Act of two years later in taking the power from the council and vesting it in the board.

The powers of the Court of Common Council over this subject were derived mainly from section 7 and the provisions of section 8, which gave the court power to make, alter, and repeal ordinances for the following (among other) purposes : " For the laying out, altering, establishing and making highways, streets, parks, public grounds and walks, openings for the circulation of air, building lines, drains and sewers; to drain and raise low lands ; to make, repair, purify, light and keep open and safe for public use and travel, and free from encroachments or obstructions the streets, highways, passways and public grounds and places in said city ; " and " to provide for the election and prescribe the duties of city surveyors, port-wardens, coroners, street commissioners," etc. It is patent that the Act of 1869 rendered inoperative a large portion of section 7 as re-enacted in 1867, and greatly modified the operation of the provisions of section 8. It is also patent that the power over highways and related public works, as apportioned by the operation of the Act of 1869,

left with the council the duty of determining the policy of such public works, and imposed upon the board the duty of carrying them out in pursuance of that policy. To the legislative body belongs exclusively the power of ordering a new work; to the executive body the sole power of execution in pursuance of the policy established by such order. As to the new public works specified in the Act of 1869, the board has the power and is charged with the duty of causing to be executed the orders of the council; as to new works not so specified, the board is charged with the same duty unless such other public works are expressly ordered to be executed by other persons; but when the specified public works have been established, the board is directly charged with the duty of maintaining them as necessity demands, without orders from the Court of Common Council. Thus, when a highway is to be constructed or altered, the council determines the policy and orders the public work; it then becomes the duty of the board to execute such order, and with all matters properly belonging to such execution the council cannot interfere; but when the highway is completed, the board has the power, and it is its duty, without orders from the council, to maintain such highway in repair, to keep it clear from obstructions and nuisances, and to remove all filth and encroachments; and so, when the erection of street lamps in the new highway, or a new system of street lamps for the whole city, is needed, the council determines the policy and orders the erection of the needed lamps, which orders the board executes; but after the policy has been determined, it then becomes the duty of the board, without orders from the council, to superintend and provide for lighting the lamps and for maintaining them in repair.

At the time the contract in question was executed, the council had determined the policy of a system of street lamps for lighting the whole city; that policy involved the use of electricity as the mean for lighting the lamps, and the erection of the street lamps, not by the city itself, but by the corporation who should furnish the means for lighting. Such fact sufficiently appears from the record. The

complaint alleges that the defendant corporation had erected lamps distributed about the city, and had before furnished electricity for lighting the same, and by plain inference also alleges that such lamps were distributed properly for the purpose of lighting the city. In the absence of any allegation to the contrary, we are bound to presume that the erection and distribution of these lamps was properly done in accordance with the policy adopted by the Common Council. In such case it is entirely clear that the Act of 1869 gives to the board of street commissioners the power, and imposes on them the imperative duty, of providing the electric current necessary for using these lamps, of superintending their lighting, and of maintaining them in repair. This duty the board could not adequately perform without making some contract for that purpose. There can, therefore, be no doubt of the authority of the board to bind the city by some agreement relative to the subject-matter of the contract in question.

The contract set up in the complaint, so far as it binds the city, is an agreement to pay the defendant at a fixed rate for the electricity necessary to lighting the street lamps erected under authority of the Court of Common Council. Such a contract the board had full power to make, and no approval of the council was necessary to its validity.

But the plaintiff claims that this particular contract is void because it was executed in violation of two city ordinances.

A city ordinance provides that the board "shall make provisional contracts, subject to the approval of said court, for such public works connected with the highways, etc., and the erection or lighting of street lamps and repairs of the same, as ought to be in the judgment of said board, let out to contractors." It may be that the council did not intend by this provision to do more than instruct the board, when it found the interests of the city would be served by a contract covering in whole or in part matters requiring the action of the court, to make such contract provisionally, subject to the approval of the court · but if the ordinance

must be construed as rendering invalid every contract for lighting the street lamps which the board may make without the approval of the court, then the ordinance is to that extent void.

The plaintiff suggests that, even if the board has power to make a temporary contract, it does not have power to contract, as in this case, for a period of five years; and that a contract for that length of time does require the concurrent action of the council. The authority of the board in contracting for lighting the street lamps is limited in various ways, and in making such contract for any extended term it would undoubtedly be preferable, and in some cases might be necessary, to have the concurrent action of the board and the council; but the authority does involve the power to contract for such length of time as may be reasonably necessary. A period of one year might be reasonable, while a period of twenty years would be unreasonable. It may be that the period of five years might under some circumstances be held unreasonable. But in this case the contract binds only the defendant for five years, and leaves the city at liberty to terminate the contract at any time, upon three months' notice, if it should not be satisfied with the manner in which the defendant performs its part of the contract, of which performance the city is the sole judge. *Zaleski* v. *Clark*, 44 Conn., 218. We cannot say that the mere fact this contract may extend for five years, in case the city continues so long to be satisfied with its performance, makes it void. It is unnecessary to consider how far the board or the council can bind the city absolutely by such a contract for a fixed term of years.

A city ordinance passed in 1886 is as follows: "All contracts for city work exceeding in amount $500, shall be publicly advertised, and the contract awarded to the lowest responsible bidder, provided he shall furnish a satisfactory bond for the faithful performance of his contract." The contract with the defendant was not advertised, and the claim is that it is therefore void.

When a statute confers on a public officer the power to

make a contract, and requires the officer to advertise for bids before making the contract, such advertising is a condition precedent to the grant of authority, and without the advertising there is no authority; hence contracts so made are held to be void. *Shumm* v. *Seymour*, 24 N. J. Eq., 153. But when a general statute requires such advertising, it should not be strained beyond the reasons which support it; so such a statute has been held in other jurisdictions not to apply to a patented article, nor to the furnishing of an article such as gas, of which one company has a monopoly, nor to articles dependent for value upon the personal skill of the manufacturer, such as fireworks; nor to professional services. *Hobart* v. *City of Detroit*, 17 Mich., 246; *In re Dugro*, 50 N. Y., 513; *Harlem Gas Co.* v. *Mayor, etc.*, 33 id. 309; *Detwiller* v. *City of N. Y.*, 46 How. Pr., 218; *Smith* v. *Flagg*, 5 Abb. Pr., 232.

The common council by virtue of a general authority to legislate for the city's interests, derived from the same source as the power of contracting vested in the street commissioners, requires a certain class of contracts for city work to be advertised. Whether such an ordinance can have the effect of an act of the legislature, in limiting the authority of the council granted by the legislature, may be doubtful; but it seems clear from a careful reading of the whole ordinance that it was passed with special reference to work to be done for the city and let out to contractors, and does not necessarily apply to an agreement fixing the price of electricity daily used by the city, and which cannot be furnished except by a company which has received the special permission of the legislature and of the city for that purpose. In this case it appears by the record that the defendant, by reason of its ownership of the plant erected by permission of the city, was practically the only person who could without delay furnish the electricity; we do not think that in such case the mere fact that the agreement has not been advertised makes it void by force of the city ordinance.

As the board of street commissioners were empowered to provide for lighting the electric lamps, and to bind the city

by a proper agreement for that purpose, and as this particular agreement is not void for the reasons alleged in the plaintiff's complaint, the demurrers to the complaint were rightly sustained.

There is no error in the judgment of the Superior Court.

In this opinion the other judges concurred.