NORMAN C. STEVENS ET AL. *vs.* THE BOARD OF WATER COMMISSIONERS OF THE CITY OF HARTFORD ET AL.

First Judicial District, Hartford, March Term, 1925.

WHEELER, C. J., BEACH, CURTIS, KEELER and MALTBIE, Js.

A review of the statutory origin and history of the Board of Water Commissioners of the City of Hartford, necessarily leads to the conclusion that it is an agency of the city government rather than a distinct municipal corporation, and that it is,

therefore, subject to the provisions of the Hartford city charter (18 Special Laws (1921) p. 859), that "no vote or resolution of said common council, or any branch of said city government, ordering a public work or improvement which shall require an expenditure of more than twenty-five thousand dollars, shall be valid and effectual unless approved by a majority vote of a city meeting, duly warned and held for that purpose, which vote shall be by ballot or voting machine."

The plaintiffs, as electors, taxpayers and inhabitants of the city were entitled to an injunction to restrain the erection by the Board of Water Commissioners of a headquarters building, costing in excess of $25,000, which had not been approved by a majority vote of a city meeting.

In determining the amount involved, the cost of employing architects should have been included in the total cost of construction, unless their services were merely in the nature of a preliminary survey and had no direct relation to the building actually to be constructed.

An ordinance of the city providing that "said Board of Commissioners may make contracts for labor and materials for the construction of water works which, when ratified by the Court of Common Council, shall be valid and binding on said city," is a general limitation upon the contractual powers of the board and requires ratification of all contracts of the kinds specified.

Argued March 5th—decided April 3d, 1925.

SUIT by the plaintiffs as electors, taxpayers and inhabitants of the city of Hartford for an injunction restraining the defendant board from entering into a proposed contract, brought to the Superior Court in Hartford County and reserved by the court (*Jennings, J.*), upon an agreed statement of facts, for the advice of this court.

*W. Arthur Countryman, Jr.,* for the plaintiff.

*Alvan Waldo Hyde,* with whom was *Edward M. Day,* for the defendant Board of Water Commissioners.

MALTBIE, J. For many years previous to 1917, that portion of the charter of the city of Hartford which

constituted the court of common council and established the procedure by which it might enact valid ordinances contained a limitation, as follows: "it being expressly provided that no vote or resolution of said common council, ordering a public work or improvement, which shall require an expenditure of more than ten thousand dollars, shall be obligatory on said city, unless approved by a majority vote of a city meeting, duly warned and holden for that purpose; which vote shall be by ballot." 5 Special Laws (1859) p. 320. This provision was reënacted in 1917, except that the sum named was increased to $25,000. 17 Special Laws (1917) p. 888. In *Johnston* v. *Hartford,* 96 Conn. 142, 113 Atl. 273, decided April 5th, 1921, this court held, among other things, that a vote of the board of street commissioners of the city ordering a street to be paved and assessing the expense upon adjoining property holders did not fall within the purview of the provision just quoted, because, even though the charter of the city required that such a vote should be submitted to and approved by the common council, still it was the vote of the board and not of the council which really ordered the improvement. Immediately application was made to the General Assembly for an amendment to the charter of the city and the proviso in question was altered to read: "It being expressly provided that no vote or resolution of said common council, or any branch of said city government, ordering a public work or improvement which shall require an expenditure of more than twenty-five thousand dollars, shall be valid and effectual unless approved by a majority vote of a city meeting, duly warned and held for that purpose, which vote shall be by ballot or voting machines." 18 Special Laws, p. 859, approved June 2d, 1921. The board of water commissioners of the city is now undertaking, at a cost greatly in excess

of $25,000, the erection of a headquarters building, to be used by it as a part of the water-works system which it maintains to supply the city with water. This building clearly falls within the phrase "a public work or improvement;" *Inhabitants of Wayland* v. *County Comrs. of Middlesex,* 70 Mass. (4 Gray) 500, 501; and the principal question we are asked to decide is, whether or not the board is to be deemed a "branch of said city government," so that its vote ordering the construction of the building must be submitted for approval at a city meeting.

The board of water commissioners was first constituted by an Act of the General Assembly passed in 1853. 3 Special Laws, p. 386. By that Act "the mayor, aldermen, common council and freemen of the city of Hartford," were authorized to establish a water-supply for the city and to issue for that purpose evidences of debt, which should be "obligatory upon said city and the inhabitants thereof" and should run to an amount and in a form to be determined in a city meeting. The board was directed to proceed with tentative plans and preparations and to make "conditional contracts" for securing a water-supply for the city, and to report their plans, estimates and "conditional contracts" to the common council, "who may approve or reject the same," any contract "ratified" by the council thereupon to become "obligatory" upon the city. Upon approval of its plans, the board was "empowered to take and hold, for and in behalf of said city," any lands or other estate necessary for its purposes, and to prosecute or defend any action at law or in equity, by the name of the "Board of Water Commissioners of the City of Hartford," as to any matter under its superintendence, the board to "be regarded as a corporation for the purpose of suing or being sued." The "board" was authorized to institute condemnation proceedings

and to make contracts for labor and materials "to be
binding on said city, when ratified by the court of
common council." It was to be trustee of evidences
of debt issued by the city, the issuance of which, if
authorized by the city, it was to superintend, and
which it might sell or, under the direction of the
common council, pledge, but the common council was
to direct what sum of money should be raised in this
way "before they shall permit the construction of
water-works to be commenced and prosecuted." The
board was directed to elect a president, to be approved
by the common council, who was to perform various
duties indicated and such other duties connected with
the water-supply "or with other business of the city"
as should be assigned to him by the common council.
All claims against "said commissioners or said city on
account of said water-works" were to be presented to
the board and, if approved by it, were to be laid be-
fore the common council "who may allow the same and
direct" their payment. The commissioners were re-
quired to report to the common council semiannually
and give such further information as the common
council might require from time to time. After the
completion of the water-works according to the plans
approved by the common council, the board was
directed to regulate the distribution and use of water
in the city, subject in most matters of importance to a
requirement that its acts were to be approved by the
common council, and to the further provision that it
should not reduce the water rates below a fair and
reasonable compensation for the use of the water, if
the effect would be to make the income insufficient to
pay the annual expenses of the "water-works" and in-
terest on the debt incurred in building them, "except
by a vote of two-thirds of the legal voters of the city,
at a city meeting." All avails of water rents above

those needed for current expenses or the extension of pipes were to be paid monthly to the city treasurer, after an audit by the city auditor, to be used to discharge interest upon the outstanding debt, and, if there was an excess, the common council might direct whether it should go to extinguish the debt or to enlarge the water-works. In the event of a deficiency in the sums needed to meet interest on the outstanding debt and current expenses, a tax was to be laid "on the grand list of all persons liable to city taxation;" and the Act closed with a provision for its submission to a meeting of the city for approval as a part of its charter.

We have referred at length to the provisions of this Act because their mere rehearsal shows without added argument that in its origin the board of water commissioners, instead of being an *imperium in imperio*, was a part, and a very subordinate part, of the city government. It was the city that was authorized to establish the water-supply, and there was hardly an act of consequence which the board might make effective unless the approval of the common council or the city were first had; the indebtedness it might incur was an indebtedness resting upon the city, and, in case of a deficiency of assets, it was to a city tax that creditors must look for payment; claims against it were paid out of the city treasury, if approved by the council; and its receipts above current expenses went into the city treasury to be disbursed by the treasurer or under direction of the council. In 1904, the charter of the city of Norwich contained provisions substantially similar to those just summarized; 7 Special Laws, p. 198; *Smith* v. *Water Commissioners*, 38 Conn. 208; and this court held in *Hourigan* v. *Norwich*, 77 Conn. 358, 363, 59 Atl. 487, that for any negligence in the performance of the work of supplying water to the city,

the city was itself liable, because "the acts . . . were done by the defendant city, and none the less so that they were done through the board of water commissioners." See also *Richmond* v. *Norwich,* 96 Conn. 582, 590, 115 Atl. 11; *Morton* v. *Power,* 33 Minn. 521, 24 N. W. 194; *Water Commissioners* v. *People ex rel. Springfield,* 137 Ill. 660, 27 N. E. 698; *Water Commissioners* v. *Binghamton,* 158 N. Y. Supp. 888.

In 1859, the charter of the city had its last revision and the Act of 1853 above outlined was woven into it. 5 Special Laws, p. 329. The board of water commissioners was continued and was directed to continue to supply water to the city; and the Act provided that the board might take and hold lands or estate "for and in behalf of said city;" that it was "in general, to do any other act necessary or convenient for accomplishing the purposes of supplying said city with water;" that it could prosecute or defend actions in its own name, and institute condemnation proceedings; and it concluded as follows: "It shall be the duty of the court of common council of said city to make ordinances, prescribing the duties of the board of water commissioners not expressly prescribed by this act; their powers over the water fund of the city of Hartford, and duties relative thereto; the officers of said board and their compensation, and bonds and oaths, and the powers of said board over the water-works of said city; and the mode in which water rents or taxes shall be secured by lien on lots, houses, tenements, or otherwise, or shall be collected; also, relative to the proper number of said commissioners to constitute a quorum." In pursuance of this authority the common council in 1860 passed ordinances providing that the monthly accounts of the board should be examined by its auditing committee; that the president of the board should give a bond to the city for the faithful per-

Stevens *v.* Water Commissioners.

formance of "his official duties due to the city," in the sum of $10,000; and restated, in almost identical language with that in the Act of 1853, the powers and duties of the board with reference to evidences of debt, duties of the president, making of contracts, reports, presentation and payment of claims, and laying of taxes to meet any deficiency. It was, however, provided that the board was to hold all receipts from the sale or pledge of evidences of debt, "subject to be drawn out only upon the written order of the city treasurer" and that, while they were to account for the avails of water rents, they were to hold any balance that might be left above the needs for current expenses "in trust . . . subject at all times to the order of the city treasurer." Charter and Ordinances, City of Hartford, 1862, pp. 26, 29, 83, 85.

Since 1859, numerous Acts have been passed by the General Assembly authorizing the board to increase its sources of supply, establish reservoirs, extend its mains, and the like, but previous to 1897 no important power was conferred upon it which it could exercise without the approval of the common council or the authority of a vote at a city meeting; 5 Special Laws, pp. 456, 539, 769; 6 Special Laws, p. 713; 7 Special Laws, pp. 682, 878; a seemingly broader Act, passed in 1875, was evidently but an addendum to an Act of the previous year authorizing the construction of reservoirs in West Hartford, if the mayor and common council of the city consented. 7 Special Laws, pp. 682, 878. A revision of the charter which was passed by the General Assembly in 1882, but which failed of adoption by the city, took from the board its principal powers, specifically vested in the city all property "now held by the board of water commissioners of said city, for and in behalf of said city," and directed the board to execute all papers necessary to perfect

title in the city; 9 Special Laws, pp. 619, 643, 644; a provision the significance of which lies in this, that the General Assembly surely would not have provided that the board should be so summarily deprived of its property interests in the water-supply system, then of no inconsiderable value, had it looked upon the board as in any sense an entity apart from the city.

In 1897, the board was authorized to take a branch of Salmon Brook as an additional water-supply for the city, without having first to secure approval of the common council or of the voters at a city meeting; 12 Special Laws, p. 986; but this power was never exercised by it. In 1911, however, provision was made for the establishment of the Nepaug supply, and in connection with that, the board was authorized, "in behalf of said city," but without first securing its approval or that of its common council, to take and hold Nepaug River and connecting streams, and any land or property "which said board may deem necessary or convenient" for its purposes, to construct and maintain a compensating reservoir on the east branch of the Farmington River, and to institute condemnation proceedings or to petition the court for approval of changes in the highways or the removal of cemeteries. 16 Special Laws, pp. 389, 390. Subsequent to 1895, other lesser powers were also given to the board to be exercised at its own discretion. In the same period, however, the section of the charter of 1859 above quoted, giving the common council power to make ordinances with reference to the board, has been twice reënacted, with slight changes of no moment to our inquiry; 16 Special Laws (1913) p. 845; 18 Special Laws (1921) p. 434; and in another Act, giving the board power to harvest and sell ice, it was provided that its regulations and rates should be approved by the common council. Perhaps more significant is the

fact that, ever since 1859, all laws authorizing the issuance of bonds in connection with the water-supply system have used the same terms as have laws conferring on the city power to issue bonds for other purposes; it is the common council which has been authorized to issue them, "under the corporate name and seal" of the city; they are expressly made "obligatory upon said city and the inhabitants thereof;" and the city treasurer holds the avails, subject to the direction of the common council and the provisions of the charter. 7 Special Laws, p. 682; 11 Special Laws, p. 157 (two issues); 13 Special Laws, p. 307; 15 Special Laws, p. 802; 17 Special Laws, p. 120; 19 Special Laws (1923) p. 127. In one of these Acts the purpose of the issue is stated to be to fund temporary loans "to said city for its water department;" 11 Special Laws, p. 157; and in a later Act reference is made to "any department of the city, except the water and park departments." 18 Special Laws, p. 361.

One cannot find in this history any substantial evidence that the relationship of the board to the city has altered from that it originally occupied. It has been given greatly increased powers to take and hold lands and properties, and is holding today property of immense value, but it has always done this in behalf of the city. It has been authorized to institute or defend actions in its own name, but its attribute in that respect is well expressed in the original Act of 1853; the board was "to be regarded as a corporation for the purposes of suing or being sued." It has been authorized or directed to extend its mains and furnish service in other towns, but that does not mean that it is any less a part of the city government of Hartford, for the power of one municipality, when properly authorized, to carry on such activities within the limits of another is well known to our law. 3 Dillon, Mun.

Corp. (5th Ed.) § 1299; General Statutes, § 388. In *West Hartford* v. *Water Commissioners,* 44 Conn. 360, 369, this court spoke of the board as an "agency" of the city, holding the lands acquired by it as a trust, saying that "in substance the land was bought and paid for by, and clearly now is, the property of, the city." In *West Hartford* v. *Water Commissioners,* 68 Conn. 323, 331, 36 Atl. 786, in considering the extent of the obligation resting upon the board under a certain special law to furnish water to certain inhabitants of West Hartford, this court again spoke of the board as an "agency in the carrying on of the municipal government" of the city and, for the purpose of the case, identified it with the municipal corporation; and in *Water Commissioners* v. *Bloomfield,* 84 Conn. 522, 529, 80 Atl. 794, in considering another similar Act, it called it a "municipal agency." In *Water Commissioners* v. *Manchester,* 87 Conn. 193, 195, 87 Atl. 870, this court, in passing upon its powers to condemn lands, called the board "a department or agency of the municipal government of the city." The phrase "any branch of said city government," used in the Act in question, very likely had its origin in *Hartford* v. *Hartford Electric Light Co.,* 65 Conn. 324, 331, 32 Atl. 925, where this court, HAMERSLEY, J., held that the power to provide for lighting the streets was vested in the board of street commissioners of the city as an independent department of the city government, it being for such purpose made a "branch of the city government distinct from the court of common council." This decision was followed in *Johnston* v. *Hartford,* 96 Conn. 142, 153, 113 Atl. 273, where it is said that that board was made a "branch of the city government, not subordinate to the common council." One of the definitions of "branch" given in the Century Dictionary and Cyclopedia is: "Any member or part of a body or

system; a department; a section or subdivision." See also Webster's New International Dictionary; Standard Dictionary. In *Ham* v. *Mayor,* 70 N. Y. 459, 462, the Court of Appeals, Miller, J., in holding that the city of New York was not liable for negligence in the conduct of a school by the department of public instruction because of the latter's independence of control by the city, says that the law created that department a "branch of the government of the city of New York."

The board of water commissioners falls well within the natural meaning of the phrase "any branch of said city government." Had the legislature meant to include only the board of street commissioners, it would not have used the same general phrase; yet the history of the Act indicates that the legislature had in mind departments or agencies related to the city government in something the same way as is that board and exercising authority over considerable expenditures of public money. An examination of the city charter shows only two of these: the far less important and powerful board of park commissioners and the board of water commissioners. One can hardly conceive that the former was meant to be included in the Act and not the latter.

It is true that, in construing the provision in question, this court, in *Park Eccl. Soc.* v. *Hartford,* 47 Conn. 89, 93, held that it was not intended to apply in a situation where, even if the total cost of a public improvement exceeded the sum named, yet by reason of the assessment of benefits against property specially benefited the cost actually to be paid by the city was less than that sum; and the court stated that the purpose of the provision was to protect the taxpayers of the city against extravagant and unnecessary expenditures, and that such a purpose could be served by

limiting the operation of the clause to improvements which affect the public at large and which are paid for by the city. See also *Whitmore* v. *Hartford,* 96 Conn. 511, 114 Atl. 686. The furnishing of water to the inhabitants of the city certainly is a service which affects the public at large as distinct from that limited class against whom are laid assessments for special benefits resulting from a local improvement. It is true that the board has for many years borne all expenses entailed in furnishing that water to the city from its receipts for water rents, and probably will be able to continue to do so for an indefinite time in the future; still the money it uses is, like the land it holds, none the less the city's money because it does not go into the regular city treasury; the obligation of its bonds, now outstanding to the amount of $4,615,000, rests primarily upon the city and its taxpayers, and for any deficiency of income to pay these or any other obligations of the board, the taxpayers of the city must respond. *West Hartford* v. *Water Commissioners,* 44 Conn. 360. These taxpayers do have a direct, if not immediate, interest that the expenditures of the board be not extravagant or unnecessary. The circumstance that they may not be called upon actually to delve into their pockets would be apt, were we concerned with the wisdom of including the board within the limitation; but our concern is with the question whether the legislature has expressed an intent to include it. We think that it has.

As has already been noted, it was provided in the Act of 1853 establishing the board, that the board might "make contracts for labor and materials for the general purposes contemplated by this act (to be binding on said city, when ratified by the Court of Common Council)." After the revision of the charter in 1859, this provision was taken over among the ordinances

then adopted in this form: "Said Board of Commissioners may make contracts for labor and materials for the construction of Water-Works, which, when ratified by the Court of Common Council, shall be valid and binding on said city;" and so it stands to this day.  The board contends that this ordinance should be construed to mean that, while it may make contracts valid and binding as regards itself, these will not be binding upon the city until ratified by the common council.  What we have already said in effect answers this contention.  If the board is a department or agency of the city, and not a separate entity, if the property standing in its name is in truth property of the city, any contract binding on it would be binding upon the city and enforceable out of the city's property.  That we have said to be the effect of contracts made by the no less independent board of street commissioners of the city.  *Hartford* v. *Hartford Electric Light Co.*, 65 Conn. 324, 333, 32 Atl. 925.  Such a contract can have no validity apart from the obligation it imposes upon the city.  The board next contends that, if this be the effect of the ordinance, then it is void as an attempt to limit it in the performance of duties imposed upon it by law.  That might be so if, the board having become bound to furnish a water-supply to the city, the common council, without specific authority, assumed to pass such an ordinance as the one in question.  *Hartford* v. *Hartford Electric Light Co.*, 65 Conn. 324, 32 Atl. 925.  The board is, however, proceeding under the authority of the charter of 1859.  This Act, in one section, provides that the board shall be empowered to supply water to the city, to take and hold lands and other property for that purpose, "and in general, to do any other acts necessary or convenient for accomplishing the purposes of supplying said city with water; and to distribute said

water through said city;" and in the next section the Act contains the provision already quoted, making it the duty of the common council to enact ordinances prescribing the duties of the board not expressly prescribed in the Act, and "the powers of said board over the water-works of said city." The effect is as though the authority conferred upon the board was specifically made subject to the control of the common council. The word "water-works" is evidently used broadly to include the whole water-supply system, and the ordinance in question is a valid exercise of the power conferred on the common council. "The powers definitely given to each department are modified in their exercise by powers definitely given to the other; the harmonious operation of the system must depend upon the application of that good faith, assumed in all divisions of governmental power, which requires each set of officers to exercise their powers in harmony with the powers given to others; so that the object of the legislature in the apportionment of municipal functions which are essential to the accomplishment of one result, may be made effective for the protection of the city's interests." HAMERSLEY, J., in *Hartford* v. *Hartford Electric Light Co.*, 65 Conn. 324, 329, 32 Atl. 925.

The board has entered into a contract with certain architects for the preparation by them of plans and for the supervision of the construction of the building in question, under which they will receive about $8,500, and we are asked to say whether or not the board had authority to employ these architects without first securing the approval of a city meeting. The gravamen of the question is thus expressed in the brief filed by the board: "Whether the cost of employing architects must be included with the cost of construction in determining the amount involved in such matters." Whether or not that cost is to be included would de-

pend upon the circumstances. If the employment of the architects was not a part of the undertaking involved in the construction of the building in question, as where, for instance, it was for the purpose of a preliminary study to determine the wisdom of proceeding with the undertaking, it would stand by itself. Where, however, as apparently in this instance, the services rendered are part and parcel of the actual construction of a building which the board has ordered to be built, the amounts to be paid the architects must be included in the cost of the structure. See *Marchetti* v. *Sleeper,* 100 Conn. 339, 342, 123 Atl. 845.

We answer the questions stated in the reservation as follows: To the first question, asking whether the board had authority to enter into a valid contract for the construction of the headquarters building in question, to cost $140,345, without approval by a majority vote at a city meeting, we answer, No. To the second question, asking whether the board had power to employ architects to prepare plans and supervise the construction of the building in question without such approval, we answer—interpreting it as has the board in its brief—No. To the third question, whether the power of the board to contract for the construction of buildings and other structures as a part of the waterworks is limited by the provisions of the Act of the General Assembly approved June 2d, 1921, we answer, Yes. To the fourth question, whether the board has power to make contracts for the furnishing of labor and materials for the construction of water-works without securing ratification of such contracts by the common council, we answer, No.

The Superior Court is advised to enter judgment in accordance with the foregoing answers to the questions

reserved. No costs will be taxed in this court in favor of any party.

In this opinion the other judges concurred.