DENNIS A. BLAKESLEE ET AL. *vs.* THE BOARD OF WATER COMMISSIONERS OF THE CITY OF HARTFORD.

MALTBIE, C. J., HINMAN, BANKS, AVERY and JENNINGS, JS.

Argued December 5th, 1935—decided February 5th, 1936.

*Arthur L. Shipman* and *James W. Carpenter,* with whom were *W. Arthur Countryman, Jr.,* and *Charles S. House,* and, on the brief, *Olcott D. Smith,* for the appellant (defendant).

*Hugh M. Alcorn* and *Benedict M. Holden,* with whom were *George E. Hall* and *Harold E. Mitchell,* for the appellees (plaintiffs).

MALTBIE, C. J. Early in the century plans began to be developed by the defendant board of water commissioners to provide an additional water supply for the city of Hartford. As matured they involved the construction of a large reservoir system which would impound the waters of two streams tributary to the Farmington River. This might injuriously affect the owners of certain mill and power sites upon the river, and an agreement was made with them in accordance with which, under specific legislative authority, the board was to construct upon another tributary of the river a compensating reservoir which would be so operated as to equalize the flow of the river. 16 Special Laws, p. 390. The contract to construct the dam for this reservoir was duly awarded to the plaintiffs by the board, and was signed August 23d, 1915. They began work under the contract and were carrying it on when this country became a participant in the world war. The costs of material and labor had at that time advanced and were advancing very rapidly, due to war conditions, and the plaintiffs encountered serious difficulties in procuring them. The basis of their claim in this action as stated in their complaint is that, confronted with these difficulties, which were not and could not have been foreseen when the contract was made, they notified the defendant that it would be impossible to continue the work at the prices specified in the contract; that the defendant agreed with the plaintiffs that if they proceeded with the work the defendant would waive the penalties which were fixed in the contract for a failure to complete it within the time specified and that, if proper legislative

authority could be secured, the defendant would do all in its power to change the compensation provided in the contract so as to prevent the plaintiffs from suffering any actual loss; that, relying upon this promise and assurance, the plaintiffs did continue with the work; that in 1919, before the completion of the contract, a legislative act was passed (Public Acts, 1919, Chap. 187), under the terms of which payment to the plaintiffs of a sufficient sum to save them from loss was authorized, but that the defendant has refused to pay the plaintiffs' claim for such loss. To the complaint a demurrer was filed, and from a judgment for the defendant consequent upon the sustaining of that demurrer and the refusal of the plaintiffs to plead over, an appeal was taken to this court. The ruling of the trial court was held to be erroneous and the case remanded for further proceedings. *Blakeslee v. Water Commissioners,* 106 Conn. 642, 139 Atl. 106. Thereafter the complaint was amended by adding a second count, but a demurrer to this count was sustained. The case was referred to a state referee, who, after extended hearings, made his report. The defendant filed a remonstrance and has appealed from a judgment for the plaintiffs following the substantial overruling of that remonstrance.

In the remonstrance the defendant attacked several of the findings of the referee and sought many additions to the report. The trial court made certain corrections in and additions to it. Any discussion of the further changes which the appellant now seeks to have made would unduly prolong this opinion, and it must suffice to say that few changes or additions can be made by us which would materially affect the issues of law presented for our determination and those we do make are incorporated in this opinion without specific reference. We summarize the principal facts

so as to present in general the issues of law, leaving, however, certain elements in the case for discussion in connection with the claims of the parties. At all times during the progress of the work upon the compensating reservoir it was urgently important that it should be completed and ready for operation as soon as possible under existing conditions. Before July 17th, 1917, Caleb M. Saville was chief engineer in charge of the work, but on that day was appointed manager under an ordinance of the city directing the board to appoint such an official, to have charge, subject to its orders and instructions, of the engineering, construction and management of the water system, and to perform such other duties as might be imposed upon him by the board. Revised Ordinances of Hartford, 1920, § 280. The plaintiffs commenced work under the contract awarded to them about September 1st, 1915, and proceeded in a satisfactory manner until the summer of 1916. Beginning at that time, due to general conditions in the labor market, the plaintiffs began to encounter difficulties in procuring labor, and their difficulties in that respect increased; and it also became very difficult for them to secure necessary materials due to conditions produced by the war abroad and eventually by the entry of this country into it. Under these circumstances and with the prospect of their indefinite continuance, the plaintiffs, after repeated discussions among themselves, reached the conclusion that they were within their rights in shutting down the work while the war continued.

In September, 1917, one of the plaintiffs, Clarence Blakeslee, held two conferences with Saville. Blakeslee told Saville that the plaintiffs had decided to stop work unless assured of two things, that the clause in the contract providing a penalty for failure to complete the work within the time specified would be

waived, and that the board would reimburse the plaintiffs for the additional costs of continuing the work arising out of war conditions. The first requirement met little opposition, but as to the second Saville pointed out that the board had no power to increase the plaintiffs' compensation as fixed by the contract. The possibility of enabling legislation was discussed and the first conference ended with the understanding that Saville would take the matters up with the board and report to Blakeslee. At the second conference some days later, Saville reported that the board would agree to waive the penalty clause, that the reimbursement of additional war costs was a more difficult matter, but that if the plaintiffs would continue and complete the work at contract prices, the board would agree to make such reimbursement if and when it was legally empowered to do so. Relying on the assurance so given, the plaintiffs did continue with the work but at great additional cost beyond the prices fixed in the contract.

In September, 1918, the plaintiffs, compelled by the increasing cost to borrow large sums of money to meet current expenses, sought from the board an increase in the unit prices for the different types of work specified in the contract, but upon advice of counsel that the board would not be justified in entering into any new arrangement with them, it refused their request. Thereafter an act which could authorize the board to pay to the plaintiffs the costs incurred by them as a result of war conditions beyond the contract price agreed upon for the construction of the dam, and in the preparation of which counsel for the board collaborated, passed the Legislature and was approved May 2d, 1919. Public Acts, 1919, Chap. 187. The plaintiffs, having completed the contract in February, 1920, presented to the board a statement of such costs.

The board referred the statement to Saville with directions to investigate and report. Saville thereafter wrote the attorney for the board, seeking advice as to the constitutionality of the enabling act, and, if it was constitutional, as to what obligation it imposed as regards the plaintiffs' claim. Associate counsel having been called in, an opinion was finally rendered to the board in which it was stated that the board could not pay the plaintiffs' claim under the charter and ordinances of the city and that the enabling act was unconstitutional. Meanwhile the final monthly estimate upon the basis of which monthly payments were due to the plaintiffs under the contract was submitted by them to the board and payment made; but this payment was not given or received in settlement or discharge of the plaintiffs' claim for additional war costs, which was then under active consideration by the board. On February 6th, 1922, Saville finally advised the plaintiffs that the board had passed a vote directing him to notify them that it could not allow the claim.

The referee also found that the notice given by the plaintiffs to Saville of their intention to shut down the work unless assured of reimbursement of war costs above the price fixed in the contract was received by him while he was acting within the scope of his authority as manager and chief engineer for the board, and that it was his duty to report the fact to the board; that the board knew of the plaintiffs' claim for reimbursement of war costs before the passage of the enabling act in 1919 and knew that it was based on a claim that the plaintiffs had been induced to continue the work by some assurance made by Saville as to their reimbursement for such costs; that the board with such knowledge accepted the benefit of the plaintiffs' continuance and completion of the work and dis-

allowed their claim under the mistaken belief that the enabling act was void; that the promise made on behalf of the board for such reimbursement was made and accepted as a promise to take effect if and when the board was empowered to so contract, and that the promise did not take effect until the passage of the enabling act, May 2d, 1919. The referee also found that the conditions existing in September, 1917, were not contemplated by either party and were not reasonably to be foreseen at the time the contract was executed; that the conditions were brought about by the federal government acting in the exercise of its war powers; that those conditions made the continuance and completion of the work at contract prices impossible after September, 1917; that the additional cost of completing the work, due to war conditions, was at that time beyond estimate; and that it proved to be $165,000 in excess of the already inflated costs of March, 1917.

The defendant does not contend that it had no power to incur such an obligation as that claimed to exist in this case, if certain provisions of the charter and ordinances of the city had been complied with, but it does claim that these provisions, which admittedly were not complied with, so condition its contractual powers as to preclude the imposition of such an obligation. The only provision in the charter as it was in 1917 upon which the defendant rests its claim is a portion of a section defining the method of the enactment of resolutions and ordinances by the common council which reads as follows: "It being expressly provided that no vote or resolution of the said common council, ordering a public work or improvement which shall require an expenditure of more than twenty-five thousand dollars, shall be obligatory on said city unless approved by a majority vote of a city

meeting, duly warned and held for that purpose, which votes shall be by ballot or voting machines." 17 Special Laws, p. 888. By the charter of the city the board was made a quasi-corporation, with power to sue and be sued, to take and hold lands in behalf of the city, and to do all acts necessary or convenient for accomplishing the purpose of supplying the city with water. The Legislature by these provisions created the board as the agency charged on behalf of the city with the duty of maintaining a system of water works for the purpose of supplying the city with water. Incident to the performance of that duty was the right and power, in its own name, to make such contracts as were "necessary and convenient" to accomplish that purpose. 3 Special Laws, p. 386; 5 Special Laws, p. 329; see *Stevens* v. *Water Commissioners,* 102 Conn. 218, 222, 224, 128 Atl. 713. In addition to this general grant of power, the statute authorizing the construction of the compensating reservoir specially authorized the board to make any and all contracts and agreements which might be necessary or convenient to provide for the maintenance, care and control of the reservoir; 16 Special Laws, p. 390; and the act of 1919, concerning payment to contractors by municipalities of extra costs occasioned by the war authorized any board, department or agency of a municipality which had contracted for the construction of any public work to alter or modify the terms of the contract to provide relief to any contractor from any loss due to war conditions. Public Acts, 1919, Chap. 187. The power of the board itself to make contracts was expressly recognized by a city ordinance in force in 1917 which provided that "said board of [water] commissioners may make contracts for labor and materials for the construction of water works, which, when ratified by

the court of common council, shall be valid and binding on said city." Charter and Revised Ordinances of Hartford, 1908, § 232, p. 80.

In *Johnston* v. *Hartford*, 96 Conn. 142, 113 Atl. 237, this court had before it a similar question involving the meaning of the charter provision we have quoted. The board of street commissioners of the city had ordered a street in the city to be paved and had made an assessment of benefits and damages on account of the expense to be incurred, under which an obligation to pay more than $25,000 would be imposed upon the city. The votes of the board ordering the improvement and the assessment were submitted to the court of common council for its approval, which was voted. The plaintiff, against whom benefits had been assessed, attacked the proceedings upon the ground, among others, that under the provisions of the charter we have quoted it was necessary to submit the matter to a city meeting and there secure the approval of a majority of the electors of the city. We held, however, sustaining the contention of the city, that the charter provision did not apply. We said (p. 153): "Acting under the authority and direction of these laws, the board of street commissioners selected a part of Wethersfield Avenue as the street to be paved, chose asphalt as the kind of pavement, and submitted to the common council its action and its vote ordering this public work and assessing the shares of expense. By its vote or resolution of June 9th, 1919, the common council approved this vote of the board. It was this vote, and not the approval of the common council, which was the vote ordering this public work. Therefore, the council's resolution of approval does not fall within the meaning of the provision concerning a 'vote or resolution of said common council ordering a public work or improvement.'" A contract made by the

board of water commissioners for the construction of water works is its contract, and for like reasons, the vote of the common council ratifying such a contract would not, within the terms of the charter, be a "vote or resolution of said common council ordering a public work or improvement." That this is the import of the decision in the *Johnston* case appears from the facts that, in 1921, within two months after it was rendered the charter provision in question was amended to require that any vote or resolution not only of the common council but also of "any branch of said city government" ordering a public improvement which would require an expenditure of more than $25,000 should be submitted to the voters for approval; 18 Special Laws, p. 859; and we have heretofore pointed out that the Legislature intended to include within the words quoted the board of water commissioners. *Stevens* v. *Water Commissioners,* supra, p. 229. The charter provision as it was in 1917 would not in any way preclude the imposition of an obligation such as is the basis of the plaintiffs' claim upon the city.

Section 232 of the ordinances of the city provided, as appears from the quotation we have already made from it, that the board might make contracts for labor and materials for the construction of water works, which, when ratified by the common council, would be valid and binding on the city. It then went on to provide that all such contracts should be in writing and executed in triplicate; that no such contract would be executed unless the contractor gave satisfactory security for its faithful performance; that, when not otherwise specially authorized by the common council, the board should advertise for proposals, such proposals, in order to be acted upon, to set forth a specified sum or price to be paid, without condition, limitation or alteration, and be accompanied by a proper

bond; but that nothing in the section should apply to ordinary extensions of street mains or repairs of water works. It is obvious that these provisions are designed to control the original making of contracts by the board, rather than such a situation as developed under the facts in this case. The requirement of an advertisement for proposals, for instance, could have no application to an agreement by a contractor already engaged in the performance of a contract duly made by the board not to abandon the work but to continue it under an agreement that the city would save him from any actual loss in its performance. The essential basis of competition in bidding is absent in such a situation, because under an agreement of that nature there could be no profit to the contractor. Nor would it apply to a situation very likely to arise in course of the performance of contracts for the construction of water works where the need for extra work not covered by the contract developed, because such work almost of necessity would have to be done by the contractor already engaged in the performance of the contract. That this was the understanding of those concerned is apparent from the fact that the very contract before us makes provision for such extra work and for compensation therefor without ratification by the common council or compliance with the requirements of the ordinance in question. To construe the ordinance as requiring that all modifications of a contract could only be valid if the requirements of the ordinance were met and the agreements ratified by the common council would be a serious handicap to the board in the performance of its duties, which could not have been intended. See *State ex rel. Stamford* v. *Board of Purchase and Supplies*, 111 Conn. 147, 156, 149 Atl. 410. The provision that proposals submitted shall set forth a specified sum or price without condi-

tion, limitation or alteration can only mean that, in the proposals submitted, the price stated shall be definite and certain without reservation of a right by the person submitting them to alter them, and could not have been intended to mean that no alteration affecting the compensation to be paid could be made by the board in a contract which had been ratified by the common council. The agreement stated in the report of the referee is not a new contract; it left in effect all the provisions of the contract except as regards the penalty fixed for delay and the price to be paid and modified it in these two respects only. Such an agreement would not be within the purview of § 232 of the ordinances.

There is, then, nothing in the charter or ordinances of the city which renders unenforceable such an agreement as that here claimed. That agreement was made between the plaintiffs and Saville. The latter at the time was manager of the water works, appointed under the ordinance to which we have referred which defined his duties to be to "have charge, subject to the orders and instructions of the board, of the engineering, construction, extension, supervision, care and management of the water system, and perform such other duties as may be assigned to him by the board." Charter and Revised Ordinances, 1920, § 280, p. 116. His duties were not otherwise defined, but in the minutes of the board he is spoken of as "general manager" and the terms of the contract and the report of the referee read in the light of our examination of the evidence brought before us by the defendant in its effort to have the finding corrected, make it abundantly clear that he was in direct charge and had immediate oversight over the performance of the work by the plaintiffs under the contract, and was the one with whom they dealt and of necessity

had to deal with reference to the manner of their performance of that contract and the difficulties they might encounter in continuing the work. The referee made no finding as to the authority of Saville to make an agreement binding upon the board of the nature of the one which is the basis of this action, leaving it to the court as a matter of law. In view of the very general nature of the authority conferred on him, whether he had specific authority to make such an agreement was rather a question of fact; *De Nezzo* v. *General Baking Co.*, 106 Conn. 396, 399, 138 Atl. 127; *Shaw* v. *John Hancock Mutual Life Ins. Co.*, 120 Conn. 633, 644, 182 Atl. 472; and we cannot as matter of law hold that he did have that authority. But if he did not, and the board knew, or was chargeable with knowledge, that the plaintiffs, intending to abandon the contract because of the unanticipated difficulties confronting them, continued with their work, induced to do so by and relying upon a promise made to them by him in behalf of the board that they would be compensated in such an additional sum as would save them from actual loss, the law would imply an assent on its part to the terms of that agreement.

In *Norwalk Gaslight Co.* v. *Borough of Norwalk*, 63 Conn. 495, 28 Atl. 32, it appeared that unauthorized agents of the borough agreed that if the plaintiff would look after, protect and repair its gaspipes during the construction of certain sewers, the borough would reimburse it for expense thereby incurred, that the agreement was reported to the court of burgesses, which was legally authorized to act for the borough in the matter and that that body was aware of all that had been done and that the plaintiffs were incurring expense in reliance upon the agreement; and we held the borough liable upon the agreement, saying (p. 522): "The time to deny the authority of such agents

to contract with the plaintiff, in behalf of the borough, for what they deemed to be for its interest, was when the report of their action was made. Failure then to dissent, silence when it became a duty to speak, constituted assent." See also *Cone* v. *Cullen,* 108 Conn. 126, 130, 142 Atl. 674; *Alderman* v. *New Haven,* 81 Conn. 137, 140, 70 Atl. 626. The applicable principle is that stated by Blackburn, J., in *Smith* v. *Hughes,* L. R. 6 Q. B. 597, 607, quoted by us in *Hartford Distillery Co.* v. *New York, N. H. & H. R. Co.,* 97 Conn. 1, 6, 115 Atl. 488: "If, whatever a man's real intentions may be, he so conducts himself that a reasonable man would believe that he was assenting to the terms proposed by the other party, and that other party upon that belief enters into the contract with him, the man thus conducting himself would be equally bound as if he had intended to agree to the other party's terms." Justice Holmes in *Hobbs* v. *Massasoit Whip Co.,* 158 Mass. 194, 197, 33 N. E. 495, put it in this way: "The proposition stands on the general principle that conduct which imports acceptance or assent is acceptance or assent in the view of the law, whatever may have been the actual state of mind of the party,—a principle sometimes lost sight of in the cases." See 1 Page, Contracts, § 161. Under this principle the party whose assent the law implies is liable upon the contract because he has become a party to it.

The referee found that in 1919 before the work on the contract was substantially completed the board did know that in 1917 Saville had induced the plaintiffs to continue the work by some assurance as to their reimbursement for additional war costs and that with this knowledge the board accepted the benefit of the plaintiffs' continuance and completion of the work. These findings of the referee are attacked in the re-

monstrance. Much of the evidence upon the hearing dealt with the issue of the actual knowledge of the board as to the making of the agreement by Saville. The referee found that Saville received the information as to the intention of the plaintiffs to abandon the work unless assured of reimbursement for actual war costs while he was acting within the scope of his authority as manager, and that it was his duty to report that fact to the board. Knowledge of the arrangement thereafter made between him and the plaintiffs and of their continuance of the work in reliance upon the assurance given by him came equally within the scope of his authority. To this situation would apply the rule that matters coming to the knowledge of an agent within the scope of his authority are conclusively presumed to have been reported to his principal. *Cone* v. *Cullen,* supra; *Water Commissioners* v. *Robbins,* 82 Conn. 623, 638, 74 Atl. 938; *Smith* v. *Water Commissioners,* 38 Conn. 208, 218. Whether or not the evidence proved that the board or its members had actual knowledge of the agreement made by Saville and of the fact that thereafter the plaintiffs continued the work in reliance upon that promise are not of material consequence in determining its liability. The board, within whose power it was to make such an agreement as that which is the basis of this action, was chargeable with knowledge of that promise and of the fact that the plaintiffs were carrying on the work in reliance upon it instead of abandoning the contract. The board stood by in silence while they continued with the contract until it was fully performed. Indeed, there is no suggestion in the report or even in the evidence that the board or any of its members ever dissented from or in any way opposed the continuance of the work under these conditions. It cannot now deny that it assented to the

agreement made by Saville and became a party to it. Unless there is some reason to the contrary, this imposes an obligation upon the board to perform that agreement.

The defendant does not seriously contend that the agreement was not supported by consideration given under such circumstances as to make the contract enforceable under the principles stated in *Blakeslee* v. *Water Commissioners,* 106 Conn. 642, 139 Atl. 106. There was, in the continuance of the work by the plaintiffs, instead of an abandonment of it by them as they had intended, a very real benefit conferred upon the defendant, and the circumstances found bring the case well within the statement in that opinion (p. 655): "Where the contractor can justify his refusal to proceed with the contract by showing that he is confronted with circumstances not contemplated when the contract was made which render its performance impossible or unduly onerous, and the promissor, being informed of the situation, induces him by a promise of additional compensation to proceed with it, the contractor's right to that compensation ought justly to be recognized."

We do not need to consider whether the act of 1919 imposed a duty upon the defendant to compensate the plaintiffs for additional war costs, because the board voluntarily agreed to reimburse him for such costs, and no question of the constitutionality of the act as imposing such a duty is presented by the facts in this case; and we may, at least as regards this case, accept the defendant's contention that the act was not intended to make inapplicable any provision of the charter or ordinances of any municipality defining the method by which a municipal board might make contracts binding upon the municipality, for, as we have seen, there were no such provisions in the charter and

ordinances of the city of Hartford restricting the defendant from making such a contract as that relied upon in this case. The provisions in the contract that the plaintiffs were to "bear all losses resulting on account of the amount or character of the work . . . or on account of the weather, elements or other cause" and that the board should not be liable for any payments except for those stated in the contract, were directly modified by the agreement upon which this action was brought and were superseded by it.

The original contract was in writing and under seal and contained a provision that it might be modified and changed from time to time as might be agreed upon in writing between the parties in a manner not materially affecting the substance thereof or materially increasing the amount to be paid in order to carry out and complete more fully and perfectly the work agreed to be performed. The board seeks to avoid the obligation under the agreement with the plaintiffs for the payment of additional war costs upon the ground that, being oral, it cannot under these circumstances be given effect. Unless prevented by the statute of frauds a written contract may ordinarily be modified by a parol agreement made after its execution. *Baier* v. *Smith*, 120 Conn. 568, 571, 181 Atl. 618; *West Haven Water Co.* v. *Redfield*, 58 Conn. 39, 41, 18 Atl. 978. In *O'Loughlin* v. *Poli*, 82 Conn. 427, 432, 74 Atl. 763, we said: "But the parties to a written contract, of the character of the one under review, are as free to alter it after it has been made as they were to make it, and all attempts on their part by its terms to tie up their freedom of dealing with each other will be futile." In support of this statement we cited the case of *Bartlett* v. *Stanchfield*, 148 Mass. 394, 395, 19 N. E. 549. In that case it was held that where parties enter into a parol agreement to modify a written con-

tract, the fact that the contract contained a provision that no change should be made in it except in writing would not destroy the effect of the oral agreement, if the circumstances were such that the promisee would fairly understand that the stipulation requiring a writing had been waived. Such a waiver would ordinarily arise out of a parol modification entered into by the parties and hence the general rule is stated to be that, despite a provision in the contract that it may not be changed except in writing, a parol agreement modifying its terms will be given effect. 4 Page, Contracts, § 2485.

In *Smith* v. *Lewis*, 24 Conn. 624, we held that an executory contract under seal could not be discharged or released by an executory verbal contract; and in *Dwy* v. *Connecticut Co.*, 89 Conn. 74, 87, 92 Atl. 883, we said in passing that the presence of a seal upon an instrument of release forbids a modification of its terms by parol or writing not under seal. Whether today we would apply the rule stated in *Smith* v. *Lewis*, to a state of facts similar to those involved in that case we have no need to inquire. In *Hartford-Connecticut Trust Co.* v. *Devine*, 97 Conn. 193, 195, 116 Atl. 239, we pointed out that a seal had now largely lost its significance and we said that, since Swift in his Digest first pointed out this fact, "courts have freed themselves, at least to a considerable extent, from the restraints formerly imposed by the sanctity of a ceremonial which has now lost not only its original significance, but its original form; . . . and the conclusiveness formerly attached to the seal is now transferred to the writing itself, regarded as the legal act of the promissor and the integration of all antecedent negotiations which the parties intended to have included in the written record." In *O'Loughlin* v. *Poli*, supra, the contract the modification of which was in

question was actually under seal. 91 Supreme Court Records and Briefs, p. 363. That in this instance the parties to this contract did not give to the seal attached to it the significance now claimed appears from the provision already referred to that its terms might be modified in writing, without mention of the seal, and this no doubt corresponds to the general understanding of persons entering into such contracts. The modern view is expressed in the American Law Institute Restatement, Contracts, Vol. 2, § 407, to the effect that even though a contract is under seal, it may be varied by a parol agreement. See also 3 Williston, Contracts, § 1836; 4 Page, Contracts, § 2474; note, 55 A. L. R. 692. In the situation before us we hold this rule applicable. That the original contract was in writing and under seal, and contained the provision we have referred to as to modifications being in writing, does not preclude the imposition of an obligation upon the board growing out of the parol agreement made between the plaintiffs and Saville.

The contract provided that after the completion of the work the engineer for the board would make a final estimate of the amount and value of the work done and that the board would, within sixty days after its approval of that estimate, pay the plaintiffs the sum due; except certain retained amounts, and that the acceptance of this last payment should operate as and be a release to the board from all liability to the plaintiffs for anything done or furnished for, or relating to the work, or for any act or neglect of the board or any person relating to or affecting the work, except as to the retained amounts. The referee found that when the last payment called for under the contract was made and accepted it was not given or received in settlement of the plaintiffs' claim for additional war costs and this finding is amply sus-

tained by the evidence. At the very time when the payment was made the liability of the board and the amount due the plaintiffs were under active investigation. In *Drake* v. *Starks,* 45 Conn. 96, and *Allen* v. *Ruland,* 79 Conn. 405, 411, 65 Atl. 138, we held that the terms of a general release delivered to take effect immediately could not be varied by parol evidence to show that it was not intended to include a particular claim then existing. The case before us differs essentially from the situation then before the court. Here the contract provided for a release to take effect as a result of the performance of certain of its terms in the future. The provision for the release was based upon the terms of the contract as they existed when it was made; the estimate which it was provided should be the basis of the final payment was to be made with reference to work done under and the prices fixed in that contract. The modification of the contract by the agreement which is the basis of the plaintiffs' claim introduced a new element and a new liability into the situation which was not within the contemplation of the parties when the contract was made. The words of Lord Westbury in *London & South Western Ry. Co.* v. *Blackmore,* L. R. 4 H. L. 610, 623, are applicable to this situation: "The general words in a release are limited always to that thing or those things which were specially in the contemplation of the parties at the time when the release was given. But a dispute that had not emerged, or a question which had not arisen at all, cannot be considered as bound and concluded by the anticipatory words of a general release." See also *Ramsden* v. *Hylton,* 2 Ves. Sr. 305, 310; *Turner* v. *Turner,* L. R. 14 Ch. Div. 829, 835; *Lindo* v. *Lindo,* 1 Beaven, 496, 506; *Rich* v. *Lord,* 35 Mass. (18 Pick.) 322, 325; *Blair* v. *Chicago & Alton R. Co.,* 89 Mo. 383, 393, 1 S. W. 350; 3 Elliott, Con-

tracts, § 2061. There is no reason in law why a court should hold that the acceptance by the plaintiffs of the payment based upon the engineer's final estimate of the work should be held to constitute a release of the plaintiffs' claim for additional war costs when neither party intended that it should have that effect.

Granted that the work under the contract could not be completed within a year from the time when the agreement for additional compensation was made, this action was not brought until the contract had been fully performed; in such a situation the statute of frauds would not apply to the agreement if it were separate and distinct from the original contract, for if it did, the statute designed to prevent fraud might become an instrument of fraud. *Ives* v. *Gilbert,* 1 Root, 89; *Eaton* v. *Whitaker,* 18 Conn. 222, 230; *Hendrick* v. *Lowe,* 85 Conn. 635, 638, 84 Atl. 89; *Harmonie Club, Inc.* v. *Smirnow,* 106 Conn. 243, 247, 137 Atl. 769; *Stueck* v. *Murphy Co.,* 107 Conn. 656, 662, 142 Atl. 301; *Baier* v. *Smith,* 120 Conn. 568, 572, 181 Atl. 618; Amer. Law Institute Restatement, Contracts, Vol. 1, §§ 178, 198; and for a like reason the statute does not prevent proof of an oral agreement modifying a written contract within the statute, when that contract has been fully performed. 3 Williston, Contracts, § 1555, quoted in *LeWitt* v. *Park Ecclesiastical Society,* 103 Conn. 285, 298, 130 Atl. 387; 4 Page, Contracts, § 2480.

The testimony offered by the plaintiffs as to a conference at which they and their attorney, the corporation counsel of the city and Saville were present, was admissible in evidence by reason of Saville's participation therein, in proof of the making of the agreement between the plaintiffs and him; and it is not found and we cannot hold as matter of law that the parties were then concerned in an effort to negotiate a settle-

ment. The plaintiffs offered in evidence a memorandum of the corporation counsel stating the conversation that took place at that conference and relating certain subsequent investigations made by him, which was produced in court by the defendant at the plaintiffs' request, and the trial court admitted it over the defendant's objection. When first offered only so much of the memorandum as dealt with the conference was admitted; to that portion of it the grounds of objection stated were that the conference was an attempt to settle the case, that the memorandum was not signed by Saville, that it was not binding upon the board nor a part of its records and that it gave the defendant no opportunity to cross-examine as to it. Supplementing the statement in the report of the rulings of the trial court in the matter by recourse to the evidence brought before us by the appellant in its efforts to correct the report, as we may do, it appears that the corporation counsel was later called as a witness by the plaintiffs, testified as to the memorandum and was cross-examined as to it. As against the other objections made the memorandum was admissible for the same reason as was the plaintiffs' testimony as to the conference. Later the remainder of the memorandum was admitted in evidence, but whether erroneously or not, is not now of consequence, because nothing contained in it could materially affect the decisive issues of the case. Admission of evidence offered to show that members of the board had actual knowledge of the agreement and of their attitude in the matter, even if erroneous, is of no consequence in view of the imputation to the board of Saville's knowledge and of the controlling facts upon which its liability rests.

As the liability of the board arises out of an agreement to which it became a party by the assent result-

ing from its failure to disavow the agreement made by Saville, there is no variance between the proof and the allegations in the complaint that the board made that agreement.

To attempt to discuss in detail the many claims of the parties would prolong this opinion beyond all reason. We have examined the very voluminous record and briefs and find nothing which in any way invalidates the decision of the trial court accepting the report and rendering judgment for the plaintiffs.

There is no error.

In this opinion the other judges concurred.