[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum of Decision
Plaintiff in this case, Landscape Management Services, Inc., (Landscape Management) seeks to recover in excess of $27,000 it claims it is owed in connection with snow removal services it alleges to have performed for defendant Farmington Plaza Associates, L.P. (Farmington Plaza) at Loehman's Plaza during the snowy winter months of 1993-94. Defendant Farmington Plaza, owner of the plaza, claims that it has paid all amounts owed and asserts a counterclaim, alleging that plaintiff damaged curbs and lawn areas in the process of undertaking snow removal activities.
Suit was initially brought in a one-count complaint dated June 14, 1994, asserting a mechanic's lien claim. During trial, the court permitted plaintiff to amend the complaint to add a count alleging breach of contract (Second Count) and unjust enrichment (Third Count). Trial in this matter was held on June 11, 12 and 13, 1996, before the undersigned judge. The parties then filed written memoranda, which have been reviewed.
For the reasons stated below, judgment shall enter for the plaintiff in the amount of $17,737.20, including tax, on the Second Count of the complaint, and for Landscape Services, Inc., CT Page 5332 on the counterclaim.
Inapplicability of Mechanic's Lien Statute to Snow Removal
Before discussing the evidence relating to the claims of the parties, it is first necessary to dispose of a pending motion made during trial.
On June 12, 1996, after plaintiff rested its case, defendant filed a motion to dismiss, arguing that Connecticut's mechanic's lien statute, General Statutes Section 49-33, was not applicable to snow removal services. Decision on the motion was reserved to give plaintiff a full opportunity to reply. In its July 8, 1996, Trial Memorandum, plaintiff has now responded, arguing that snow removal services may be considered "repairs" under the statute and that snow removal services are therefore properly lienable. The court disagrees and grants the motion to dismiss the First Count.
General Statutes Section 49-33(a) states in relevant part as follows:
 If any person has a claim for more than ten dollars for materials furnished or services rendered in the construction, raising, removal or repairs of any building or of any of its appurtenances or in the improvement of any lot or in the site development or subdivision of any plot of land the building, with the land on which it stands or the lot or in the event that the materials were furnished or services were rendered in the site development or subdivision of any plot of land, then the plot of land, is subject to the payment of the claim.
As the parties note, there is no Connecticut case directly on point. And it is true, as plaintiff points out, that the mechanic's lien statute is to be construed liberally so as to fairly carry out its remedial purpose. Anthony Julian R.R. Const.Co. v. Mary Ellen Drive Associates, 39 Conn. App. 544, 548-49
(1995). However, the plain meaning of the statute cannot be ignored. Stone v. Rosenfield, 141 Conn. 188, 191 (1954). Our case law makes it clear that Connecticut's mechanic's lien law has traditionally applied "only to fixtures which permanently form a part of, and constitute, real estate." Hartlin v. Cody, 144 Conn. 499,508 (1957). In Camputaro v. Stuart Hardwood Corporation,180 Conn. 545 (1980), Justice Peters decided a case involving the CT Page 5333 lienability of a contractor's work in providing road building and site preparation services under the then existing mechanic's lien act. At pages 550 through 554 of that opinion, she discusses numerous cases decided under the mechanic's lien law, stating that "Our cases construing the language of the then existing statute have required, as a condition of lienability, that the work done be incorporated in or utilized in the building (or the appurtenance) to be constructed, raised, removed, or repaired. Our other cases have consistently, with equal emphasis, insisted that mechanic's lien work be `wrought into' the liened property in some fashion." Id. at 552. She then cites Connecticut cases which have held, variously, that the installation of fixtures that do not become part of the realty, electrical work not permanently attached to the realty, and the removal of pipe from one building that is not incorporated into a replacement building, have all been held unlienable. See also the cases cited by defendant in its May 14, 1996, Motion to Dismiss, includingNickel Mine Brook Associates v. Joseph E. Sakal, P.C., 217 Conn. 361,363 (1991) (attorney's services in connection with rezoning of land and related real estate matters not lienable); King's OakLiquidators v. Bala Cynwyd, 592 A.2d 102, 103-104 (Superior Court, Pa. 1991) (cleaning services and hauling away of trash not subject to mechanic's lien law); Howard A. Deason Co v. CostaTierra LTD, 83 Cal.Rptr. 105, 113 (Court of Appeal 1970) (mowing lawn and watering it and shrubs not within purview of mechanic's lien law because permanency of improvement is an essential characteristic of work giving rise to a lien); Legault v.Suncoast Law Service, Inc., 486 So.2d 72, 73 (Fla.App. 1986) (mowing lawn and cutting shrubs do not bestow a permanent benefit on the land so as entitle a laborer to mechanic's lien protection).
Plaintiff's argument that the providing of snow removal services is a "repair" of a building or its appurtenance is unconvincing. Webster's Ninth New Collegiate Dictionary defines "repair" to mean "to restore by replacing a part or putting together what is torn or broken: fix." The word "appurtenance" has been defined as relating to a wing or addition to a building.Waterbury Lumber and Coal Company v. Asterchinsky, 87 Conn. 316,320-21 (1913). Clearly, according to the commonly accepted definition of the word "repair," a winter snowfall does not break anything and removing snow is not "repairing" a building or its appurtenances within the meaning of Section 49-33. Nor is providing snow removal services the equivalent of making an "improvement" under the statute. Manley v. Pfeiffer, 176 Conn. 540, CT Page 5334 544 (1979) (An "improvement" is any valuable addition to the property or an amelioration in its condition, amounting to more than mere repairs, costing labor and capital, and intended to enhance its value.) In short, providing snow removal services may be essential to the use of property during the harsh winter months we often experience in New England, but the providing of such services does not add to the intrinsic value of the land and amounts to neither a "repair" nor an "improvement" under Section49-33.
Trial Evidence
Plaintiff's principal witness was Donald J. Milbier, Jr., who testified that he was plaintiff's owner during the relevant time period of the dispute. Mr. Milbier testified that he had become familiar with Robert Rieger, who was general partner of the owner of Loehman's Plaza, when Mr. Milbier's company had provided snow removal services to the Quail Hollow project in New Britain, property also managed by Mr. Rieger. A dispute had arisen in connection with services offered at that project. Mr. Milbier testified that Mr. Rieger had approached him with a proposal in connection with snow removal services at Loehman's Plaza. Plaintiff's Exhibit 1. Mr. Milbier said he wanted a written contract in connection with services to be performed at Loehman's Plaza because of the prior dispute. A contract was agreed upon. Plaintiff's Exhibit 2. (A copy of the contract is attached to this Memorandum of Decision as Exhibit A.)
Beginning in December, 1993, Mr. Milbier began providing snow removal services, including plowing, sanding, and related services "as needed" based on conditions as he observed them. He then generated invoices to Mr. Rieger in connection with the services rendered. See Plaintiff's Exhibit 3, billing records. He sent invoices 594, 602 and 614 to Mr. Rieger for services rendered between December 11, 1993, and January 2, 1994. Plaintiff's Exhibit 4. He also sent invoice 632 and 2890 to Mr. Rieger for services performed between January 4 and January 19, 1994 Plaintiff's Exhibit 5. Checks signed by Mr. Rieger in full payment for these invoices were received in amounts of $6,277.85 and $11,039.90 respectively. Plaintiff's Exhibit 18, the check for $6,277.85, references in Mr. Rieger's handwriting invoices 594, 602 and 614. Plaintiff's Exhibit 19, the check for $11,039.90, references invoices 632 and 2890. Mr. Milbier testified that Mr. Rieger never complained about these initial checks or questioned the billing methodology evidenced by them. CT Page 5335
With respect to the contract, Plaintiff's Exhibit 2, Mr. Milbier acknowledged that the contract itself does not make reference to any charges being made on an hourly basis, or for charges incurred during storms, but rather appears to contemplate charges being based on a per storm, or per application, basis. Because the unanticipated amount of snow which fell that winter changed conditions and expectations, he testified, he decided to charge for certain services on an hourly basis. He testified that he charged on a per storm basis for some items, but not for others. He denied performing any work that he did not believe was authorized by Mr. Rieger, stating that Mr. Rieger had consented to the work done, although he acknowledged that he did some of the work at the request of plaza tenants without first checking with Mr. Rieger.
With reference to the contract, he testified that he construed Item III, relating to salting and sanding parking areas and roadways, to provide for a "range" of charges from $95 to $250 per application. He also testified that Item IV, relating to applying "ice melter" for all sidewalk areas, also established a "range" of between $55 and $125 per application. In connection with determining when continuous snow could be viewed as one storm, or when it could be viewed as more than one storm allowing for plowing on more than one occasion, Mr. Milbier testified that if there was a break in the snow for four or five hours and then a renewal of snowfall, he considered that there had been separate storms justifying separate snow removal operations and billings.
He testified that while the contract did not provide for any charges to be made for any services at a $55 rate, he had discussions with Mr. Rieger about the need to include such charges due to the "atypical" accumulations of snow and snow drifts and the need to remove the drifts.
Mr. Milbier testified with respect to invoices relating to snow removal services performed between January 24 and March 19, 1994, Plaintiff's Exhibits 6 through 16, which total $27,499.05 the amount claimed. He testified that none of them had been paid by Mr. Rieger, which is uncontested.
In determining the amount of snow that had fallen, Mr. Milbier said he relied upon amounts of snowfall as measured at Bradley Field in Windsor Locks. He testified that Mr. Rieger understood that the snowfall recorded at Bradley Field would CT Page 5336 provide the basis for determining the amount of snow for purposes of effectuating the contract and billing purposes. The amounts were determined for billing purposes by either him or his mother or his brother, who were all involved in the business, said Mr. Milbier.
Robert Rieger testified. He identified himself as the general partner of Kenilworth Properties, Inc., owner of Loehman's Plaza. He described the problems he had previously experienced with Mr. Milbier concerning snow removal at Quail Run, and testified that he had initially told Mr. Milbier that he did not wish to deal with him any further as a consequence of that dispute. According to Mr. Rieger, Mr. Milbier said he was upset over the previous dispute and wanted a chance to "earn back" Mr. Rieger's trust. As a result of Mr. Milbier's entreaties, Mr. Rieger said, he relented and made a proposal to Mr. Milbier in connection with snow removal services to be performed at Loehman's Plaza. He and Mr. Milbier met "a couple of times" to review the contract, Plaintiff's Exhibit 2, "in detail" according to Mr. Rieger.
"It was very clearly discussed that the charge was to be per storm," he stated. He denied emphatically that the contract contemplated hourly charges of any sort and testified that Mr. Milbier never contacted him prior to incurring any such charges.
Mr. Rieger said that he had paid invoices 594, 602, 614, 632 and — and referenced the invoices in the checks sent, Plaintiff's Exhibits 18 and 19, dated January 28 and February 18, 1994, respectively — but that he had not intended by paying these invoices to suggest that the invoices were in order. He testified that when he was making out these checks, he felt he was making a "very general payment" for all snow removal services that had been performed by the date of the checks — January 28 and February 18, 1994. "This was a good faith payment" based on what he estimated he owed toto, he testified. "In my mind, was not specifically paying" any of the individual invoices he referenced on the payment checks, he added. In fact, he testified that he was concerned about the billing methodology used by Mr. Milbier and began complaining to him sometime in January of 1994. His concern was that "the invoices weren't in line with the agreement." More specifically, Mr. Rieger flatly denied that he had ever discussed with Mr. Milbier, or agreed to, hourly plowing charges of any kind. He similarly denied that he had authorized extra amounts for loader work and snow removal. He testified that he believed that sanding and salting charges would be either $95 CT Page 5337 per application for small snowfalls, or $250 per application for large storms, without in-between charges. He denied that he had ever received a call from Mr. Milbier concerning removing or relocating snow at the request of a tenant at the plaza. He said he was totally unaware that a plaintiff had subcontracted out some of the snow removal work. He said he had specifically called Mr. Milbier four to five times between mid-January to mid-February to complain about the invoices and to request that Mr. Milbier remove totally the hourly charges and the sanding and salting charges. Mr. Rieger admitted that he had no evidence that the work claimed to have been performed had in fact not been performed by plaintiff.
Defendant called Art Horn as an expert witness. Mr. Horn, who works for Channel 30, is a meteorologist with a BA degree and 20 years of experience. At defendant's request, he reviewed weather records relating to the winter of 1993 and 1994, compiling a report describing the weather conditions and calculating the snowfall. Defendant's Exhibit E. He was able to estimate the amount of snow that fell in Avon, which is much closer to Farmington, where Loehman's Plaza is located, than Bradley Field. The report describes 31 different weather events that occurred that winter, including 17 "significant events" — involving 2 inches or more of precipitation.
Mr. Horn testified that no concrete definition of a "snowstorm" existed. Total snowfall during the time period in question was approximately 85 inches as measured at Bradley Field, he testified. In Avon, however, it was far less — in excess of 56 inches. It is for the trier of fact to assess the credibility of witnesses, including expert witnesses, and the weight to be assigned to this testimony. Humphry v. Argraves,145 Conn. 350, 355 (1958). The undersigned judge found Mr. Horn to be persuasive and credits his testimony and his report. I conclude that in light of all the evidence and Mr. Horn's expertise, Mr. Horn's estimates of the amount of snow that fell in Avon, and his description of the events of the winter of 1993-94, provide the most reliable basis upon which to determine whether the amounts billed were consistent with the agreement of the parties as expressed in the contract and were more reliable than the estimates provided by plaintiff.
Legal Discussion
It is undisputed that a written contract was entered into CT Page 5338 between the parties. Dated October 14, 1993, and signed by Mr. Rieger on November 5, 1993. It contains the agreement of the parties. Plaintiff's Exhibit 2. The evidence indicated that the written contract was based in part on a written proposal made by Rieger. The contract itself states that Landscape Management "is pleased to submit the following proposal for the removal of snow" at Loehmann's Plaza. The written contract, Plaintiff's Exhibit 2, appears to have been a joint effort of Mr. Milbier and Mr. Rieger. In light of the discrepancies in the evidence as to whether the parties agreed to modify the contract, it is the contract itself which must provide guidance to the court in deciding this case. Construction of a contract cannot be varied because of inconvenience to a party. Anderson v. Pension andRetirement Board of City of Milford, 167 Conn. 352, 536 (1974). Terms cannot be added to a contract by interpretation. Dotolo v.Petrucelli, 1523 Conn. 654, 656 (1961). Courts should not make a new contract for the parties or insert protective conditions which the parties failed to provide for themselves. Parks v.Badwin Piano Organ Co., 262 F. Sup. 515 (D.Conn. 1967). A contract must be examined as a whole and all pertinent provisions considered together. Garrity v. Radel, 151 Conn. 349 (1964). One party to a contract may not change the agreement as a result of his unilateral belief that conditions have changed. In this case, I am persuaded that where ambiguities exist, they must be construed against plaintiff insofar as the contract finally entered into was submitted by plaintiff according to its own terms. Griswold v. Union Labor Life Ins. Co., 186 Conn. 507, 513
(1982).
In my view, plaintiff has failed to demonstrate by a preponderance of the evidence that the parties modified the written contract by a parol agreement with respect to the contested amounts represented in Plaintiff's Exhibits 6 through 16. Blakeslee v. Water Commissioners, 121 Conn. 163, 182 (1936). Nor has plaintiff proven by a preponderance of the evidence that any alleged modification was supported by consideration as to these contested amounts. Thermoglaze, Inc. v. MorningsideGardens, Co., 23 Conn. App. 741, 744-45 (1991). The evidence indicates that all of the actions that plaintiff undertook were required by the terms of the contract to be on a "flat fee basis" notwithstanding the fact that it snowed more than plaintiff had anticipated. See Calamari and Perillo, Law of Contracts 2d Edition, Section 4.8, "The Pre-Existing Duty Rule: The Two Party Cases." Consequently, plaintiff's claim as set out in the Third Count is rejected because the written contract controls this CT Page 5339 dispute. Cf. Freda v. Smith, 142 Conn. 126 (1955).
With respect to the amounts billed in invoices 594, 602, and 614 (Plaintiff's Exhibit 4), and invoices 632 and 2890 (Plaintiff's Exhibit 5), I conclude in light of all the a credible evidence and the reasonable inferences drawn from it that in making full payments for these amounts, see Plaintiff's Exhibits 18 and 19, Mr. Rieger acquiesced in the amounts charged in these invoices only. I am not persuaded that in making these payments without objection, Mr. Rieger, apparently a businessman of considerable sophistication and a experience, was simply paying sums toward an overall balance he thought the defendant owed. Nor does the evidence indicate that in accepting these payments, plaintiff was accepting payment for all snow removal services provided. AirCare N.O. Nelson Co. v. Patchet, 5 Conn. App. 203,206-07 (1985). I conclude rather that the two initial payments were intended to be applied against invoices 594, 602, 614, 632 and 2890. However, in light of the full record, I conclude as well that by paying those amounts, Mr. Rieger in no way can be deemed to have agreed to the billing procedures or methodologies in subsequent unpaid bills as expressed in Plaintiff's Exhibits 6 through 16. Baier v. Smith, 120 Conn. 568,572 (1935). The evidence indicates that Mr. Rieger clearly and repeatedly objected to the billing methodology used in the invoices represented by Plaintiff's Exhibits 6 through 16. I conclude, therefore, that with respect to all of these amounts, plaintiff has failed to show that defendant agreed to modify the written contract. First Hartford Realty Corp. v. Ellis, 181 Conn. 25,34 (1980). These invoices, I conclude, must be viewed through a different analytical lens than the invoices that were paid without protest.
Plaintiff's Exhibit 2, the contract, deserves a detailed discussion. Of course, a contract must be given a common sense interpretation, and in construing a contract, the court must view the written document as the expression of the parties' intent.Gino's Pizza of East Hartford, Inc. v. Kaplan, 193 Conn. 135, 138
(1984). The fact that an approaching winter might be unusually harsh — or unusually mild — is something that must be taken into account by the parties before they enter into a contract, not in the middle of its performance. It is common knowledge that New England winters are unpredictable. In matters of weather, as in other matters committed to a written contract, financial risks and benefits must be evaluated and apportioned prior to the contract being entered into, not when performance becomes CT Page 5340 difficult or causes financial strain. In the absence of a claim of impossibility of performance, fraud or other extraordinary circumstances not present here, a party to a contract may not unilaterally change the agreement because he comes to conclude that circumstances have changed to his detriment. Dills v.Enfield, 210 Conn. 705, 717-720 (1989); Osborne v. Locke SteelChain Co., 153 Conn. 527 533 (1966) ("The courts do not unmake bargains unwisely made.") See also 17A Am.Jur.2d, Contracts, Section 669 ("As a general principal, difficulty or even improbability of accomplishment without financial loss will not release a party from his contract.") Given the facts and circumstances of this case, in the Court's view, neither plaintiff nor defendant should be permitted to benefit from the argument that there was more snow than anticipated when the written contract was entered into.
The contract itself does not specifically state that Item "Plow roadways and all parking areas," shall relate to each separate snowfall or snowstorm, but that appears to be what was contemplated. The fact that charges for snowfalls are referred to singularly, rather than in reference to a change "per application" — as is the case with Items III and IV — supports this conclusion. Nowhere is "snowfall" or "snowstorm" defined. The word "storm" is used once, in connection with the notation that $50 per storm shall be charged "If weather only requires shoveling." Nowhere is it discussed who shall decide how many inches of snow has fallen. Nor is it discussed who shall decide how many applications of sand may be applied, at what intervals, to parking areas and roadways or sidewalk areas. The plain language of the contract itself does not make it clear if salting and sanding charges are to be either $95 or $250, or whether that establishes a range (Item III); nor whether the application of "ice melter" for sidewalk areas are to be applied at a charge of $55 or $125 per application, or in that range.
Notwithstanding the ambiguities about what the contract does provide, it is clear that the contract does not provide for various items billed by plaintiff. To provide just a few examples: nowhere does the contract provide for hourly rates to be applied in connection with any of the services rendered found on invoice 709; or for trucks, trailers, and laborers to be used at hourly rates, such as is found on invoice 709; or for "during storm work" to be billed as is found on invoice 772; or for "replowing" to be done as is found on invoice 774. Review of Plaintiff's Exhibits 6 through 16 make it clear that plaintiff CT Page 5341 has repeatedly billed for items which are neither consistent with nor contemplated by the contract, which was agreed to by the parties after significant discussion. Mr. Milbier openly conceded that he billed as he did because of what he said were unforeseen circumstances — unanticipated quantities of snow — and that he did some of the work he did at the request of tenants, without first seeking Mr. Rieger's approval. To permit plaintiff to recover for items that were not contemplated by the parties as evidenced in their written agreement would, in my view, violate the understanding that the parties reached as memorialized in the written contract. In summary while some of the key terms in the contract are susceptible to different interpretations, even using everyday, common sense meanings as expressed in the dictionary,Scribner v. O'Brien, Inc., 169 Conn. 389 (1975), I conclude that hourly rates were not contemplated.
In light of all of the credible evidence at trial, and the reasonable inferences to be drawn from it, I have reviewed Plaintiff's Exhibit 3 and Plaintiff's Exhibits 6 through 16 to determine what portion of these bills are consistent with what was contemplated by the written contract. While mathematical exactitude is often impossible in determining damages, see UnitedAircraft Corp. v. International Association of Machinists,169 Conn. 473, 488 (1975), I have tried to be reasonably precise. I have been guided by the plain language of the contract and the apparent understanding and intentions of the parties as manifested in it, Downs v. National Gas Co., 146 Conn. 490 (1959) thereby eliminating hourly charges in favor of the "flat fees" contemplated by the written contract. Insofar as the contract itself did not limit the number of applications of sand and ice melter, and could have had this been bargained for, and insofar as it is not contested that plaintiff actually performed the work billed, I have permitted the applications at the amounts requested, notwithstanding defendant's arguments to the contrary, except where there is an hourly rate. I conclude that the reference to charges being made on a "per application" basis with respect to Items III and IV supports multiple charges being made for these services during a single weather event. I have disallowed requests for hourly rates for trucks, trailers, and laborers; for "during storm work"; for "replowing"; for "drifts"; and for "loader work". In some instances, where an hourly rate was apparently charged for work performed consistent with what was called for by the contract, but at a lower rate — e.g., the amounts claimed for icy walks at $40 per hour for 9.5 hours on invoice 774 — I have allowed one hour at the cost claimed, rather CT Page 5342 than multiple hours, e.g., nine. As noted above, I have accepted the testimony of Art Horn in determining when continuous snow should be billed as one event and as to the amounts of snow fall. Finally, I have allowed tax at a 6 percent rate, based on my computations. This task has been complicated somewhat in light of the general language used on Plaintiff's Exhibit 3 and some of the invoices. See Burr v. Lichtenheim, 190 Conn. 351, 360 (1983).
Using these yardsticks, in light of all of the evidence, with the contract language as my guide, I have concluded that plaintiff has proven by a preponderance of the evidence that it should recover the following sums, which include tax:
1.) Plaintiff's Exhibit 6 (Invoice 2891) (No changes from amount requested by plaintiff) . . . $4,282.40 (Tax of $242.40).
2.) Plaintiff's Exhibit 7 (Invoice 709) $5,114.50 (Tax of $289.50).
3.) Plaintiff's Exhibit 8 (Invoice 772) $265.00 (Tax of $15.00).
4.) Plaintiff's Exhibit 9 (Invoice 773) $512.10 (Tax of $30.72).
5.) Plaintiff's Exhibit 10 (Invoice 774) $1,367.40 (Tax of $77.40)
6.) Plaintiff's Exhibit 11 (Invoice 775) $100.70 (Tax of $5.70).
7.) Plaintiff's Exhibit 12 (Invoice 776) $1,293.20 (Tax of $73.20).
8.) Plaintiff's Exhibit 13 (Invoice 777) $673.10 (Tax of $38.10).
9.) Plaintiff's Exhibit 14 (Invoice 823) (No changes from amount requested by plaintiff) $1,802.00 (Tax of 102.00).
10.) Plaintiff's Exhibit 15 (Invoice 824) $1,192.50 (Tax of $67.50). (No changes from amount requested by plaintiff).
11.) Plaintiff's Exhibit 16 (Invoice 848) (No changes from amount requested by plaintiff) $1,134.20 (Tax of 64.20). CT Page 5343
TOTAL $17,737.20[1].
Defendant's Counterclaim
In its counterclaim, Farmington Plaza alleges that plaintiff caused $11,650 damage to curbs and grass areas in the course of removing snow from Loehman's Plaza during the 1993-94 winter. See Defendant's Exhibits G, H and I. Landscape Management points to the language in the contract stating that "Contractor will not be responsible for any damage to the property, roadway, curbs, and parking areas due to improper curbs." Review of the evidence, including the testimony of Mr. Milbier, Mr. Rieger and Bruce Powell, persuades the Court that defendant has failed to prove the allegations of the counterclaim by a preponderance of the evidence. While there was some evidence that Landscape Management's plows may have been responsible for some damage to some curb area, the proof was speculative as what areas were damaged and whether Landscape Management Services in fact caused the claimed damage. Moreover, defendant failed to prove the dollar amount of damages allegedly relating to the repair and/or replacement of the damaged areas with sufficient particularity to permit the court to render a judgment as to amount based on proven facts, not speculation. West Haven Sound Development Corp.v. West Haven, 201 Conn. 305, 320 (1986). In light of the questionable evidence as to causation, and the total lack of credible evidence as to the dollar amount of damages allegedly sustained, judgment shall enter for Landscape Management on the counterclaim.
Summary and Conclusion
For the reasons stated, judgment shall enter for plaintiff on Count Two of its complaint in an amount of $17,737.20. Plaintiff's request for interest is denied because the court does not conclude that the withholding of the sums at issue was wrongful, but concludes that the sums were withheld as a consequence of a good faith business disagreement as to what sums were owed. Connecticut General Statutes Section 37-3a; CecioBrothers, Inc. v. Feldmann, 161 Conn. 265, 275 (1971). Plaintiff's request for attorney's fees, based on the now dismissed First Count, is denied.
On the counterclaim, judgment shall enter for Landscape Management Services, Inc. CT Page 5344
Lavine, J.